UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.                                     Case No. 22-cr-55-jdp

JAMES LENZ,

        *Defendant.*

## OMNIBUS MEMORANDUM IN SUPPORT OF PRETRIAL MOTIONS

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF CONTENTS**

                                                                     **Page**

TABLE OF AUTHORITIES ................................................................................................iv

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND..............................................................................................3

A.      There was an explosion at Didion Milling, Inc., in late May 2017 that resulted in a terrible loss of life and prompted an investigation. ................................................................................3

B.      Before the explosion, Didion was regulated and monitored by two federal agencies, a state agency, and two third party auditors...................................................................................5

C.      Didion used two separate logbooks to comply with its workplace safety, food safety, and environmental safety obligations....................................9

      1.      The MSS log tracks workplace conditions at the mill, in order to meet Didion's food safety and workplace obligations.................................................................9

      2.      The baghouse logs track pressure readings, in order to meet Didion's environmental safety obligations................................10

D.      In the course of investigating the explosion, the Government became concerned that the MSS and baghouse logs weren't accurate...................................................................................11

E.      The Government indicted Didion and six individuals, Including Lenz...................................................................................12

      1.      Count 4 purports to allege that Lenz, Didion, and others joined in a single conspiracy, but it actually alleges two distinct agreements..............................................14

      2.      Count 6 purports to allege that Lenz aided Winch in submitting false statements to WDNR, triggering liability under 1001(a)(3).......................................18

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF CONTENTS—Continued**

**Page**

F.       Information that Lenz needs to investigate the case, prepare a
         a defense, and avoid unfair surprise at trial is missing from the
         Indictment. ...............................................................................................19

ARGUMENTS IN SUPPORT OF PRETRIAL MOTIONS ......................................................22

I.       First Pretrial Motion: Count 2 should be severed from the rest of the
         Counts and tried separately. ......................................................................22

         A.       Under Rule 8(a), Count 2 can't be joined with the rest of the
                  Counts in the indictment. ...............................................................23

                  1.       Rule 8(a)'s "of the same or similar character" test for joinder
                           focuses on an indictment's allegations. ................................24

                  2.       There is no elemental or factual overlap between Count 2
                           and the other Counts in the Indictment.............................. J26

                  3.       Beyond a categorical analysis of elements and allegations,
                           the evidence supporting Count 2 would not come in for
                           the other Counts. ..............................................................30

         B.       Under Rule 14, the prejudice of trying Count 2 together with the
                  rest of the charges means it must be severed..................................32

II.      Second Pretrial Motion: Count 6 should be dismissed insofar as it
         pertains to Lenz aiding and abetting a false statement. ...........................35

         A.       Count 6 must be dismissed as to Lenz because it fails to
                  adequately allege that Lenz had the requisite intent to aid
                  and abet Winch in submitting a false statement to WDNR
                  in mid-August 2017. .......................................................................38

         B.       Count 6 must be dismissed as to Lenz because the statute of
                  limitations already has run on any conduct that supports
                  aiding and abetting liability.. ..........................................................40

         C.       Count 6 should be dismissed in full as unconstitutionally vague..............43

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF CONTENTS—Continued**

**Page**

D.      In the alternative, Count 6 must be dismissed in part because it fails to allege that Lenz helped falsify the 2017 baghouse log. ................47

III.    Third Pretrial Motion: The Court must dismiss Count 4 because it fails to allege a single conspiracy...................................................................50

A.      For a single conspiracy to exist, as charged, the defendants couldn't have conspired until June 1, 2017—more than a year after Lenz left the corporation.........................................................................50

B.      Count 4 is duplicitous; it charges one conspiracy concerning the baghouse log and a second concerning the MSS log..............................54

IV.     Fourth Pretrial Motion: If the charges against Lenz are not dismissed in full, then the Court should order the Government to provide a bill of particulars. .......................................................................................................58

A.      The Government must identify all unindicted individuals who it may argue at trial are Lenz's co-conspirators. .............................................59

B.      The Government must identify which baghouse log entry is the one it will contend at trial is materially false. ...........................................63

C.      The Government must identify when it alleges Lenz joined and withdrew from the conspiracy. ...............................................................64

D.      The defense can't identify this information for itself and must have a bill of particulars......................................................................................66

V.      Fifth Pretrial Motion: The Government must proffer all the statements that it may seek to admit under Rule 801(d)(2)(E) for a pre-trial ruling as to their admissibility. .............................................................................................68

CONCLUSION...........................................................................................................................71

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Andersen, LLP v. United States,*
544 U.S. 696 (2005) ........................................................................................... 52

*Bean v. Calderon,*
163 F.3d 1073 (9th Cir. 1998) ........................................................................... 33

*Bourjaily v. United States,*
483 U.S. 171 (1987) ........................................................................................... 69

*Bozza v. United States,*
330 U.S. 160 (1947) ........................................................................................... 39

*Braverman v. United States,*
317 U.S. 49 (1942) ............................................................................................. 58

*Grunewald v. United States,*
353 U.S. 391 (1953) ..................................................................................... 53, 65

*Levine v. United States,*
383 U.S. 265 (1966) (per curiam) ..................................................................... 65

*Ocasio v. United States,*
578 U.S. 282 (2016) ..................................................................................... 51, 52

*Pereria v. United States,*
374 U.S. 1 (1954) ............................................................................................... 39

*Rosemond v. United States,*
572 U.S. 65 (2014) ................................................................................. 37, 39, 48

*Russell v. United States,*
369 U.S. 749 (1962) ............................................................................... 35, 36, 44

*Salinas v. United States,*
522 U.S. 52 (1997) ............................................................................................. 51

*Toussie v. United States,*
397 U.S. 112 (1970) ..................................................................................... 41, 42

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*United States v. Aguilar,*
515 U.S. 593 (1995) ................................................................................................... 52

*United States v. Aispuro,*
No. CR 08-2936 JB, 2010 WL 1404196 (D.N.M. Mar. 16, 2010) ........................................ 66

*United States v. Alexander,*
135 F.3d 470 (7th Cir. 1998) .............................................................................. 23, 24

*United States v. Allocco,*
801 F. Supp. 1000 (E.D.N.Y. 1992) ...................................................................... 60

*United States v. Anderson,*
988 F.3d 420 (7th Cir. 2021) ................................................................................ 49

*United States v. Bailey,*
840 F.3d 99 (1st Cir. 2016) ................................................................................... 31

*United States v. Barnes,*
No. 9-cr-248, 2010 WL 1418874 (E.D. Wis. 2010) ....................................... 66, 67

*United States v. Barrentine,*
591 F.2d 1069 (5th Cir. 1979) ............................................................................. 60

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987) (per curiam) ........................................................ 59

*United States v. Clark,*
67 F.3d 1154 (5th Cir. 1995) ............................................................................... 58

*United States v. Clifford,*
426 F. Supp. 696 (E.D.N.Y. 1976) ...................................................................... 63

*United States v. Coleman,*
22 F.3d 126 (7th Cir. 1994). .......................................................................... 23, 24

*United States v. Cox,*
923 F.2d 519 (7th Cir. 1991) ............................................................................... 69

v

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Cuevas*,
  285 F. App'x 469 (9th Cir. 2008) (per curiam) ................................................................. 44

*United States v. Currie*,
  No. 10-532, 2011 WL 1527014 (D. Md. Apr. 20, 2011) ...................................................... 60

*United States v. Dale*,
  178 F.3d 429 (6th Cir. 1999) ............................................................................................ 58

*United States v. Doig*,
  950 F.2d 411 (7th Cir. 1991) ............................................................................................ 28

*United States v. Dunne*,
  324 F.3d 1158 (10th Cir. 2003) ............................................................................. 37, 40, 41

*United States v. Elbaz*,
  332 F. Supp. 3d 960 (D. Md. 2018), ............................................................................ 64, 66

*United States v. Fassnacht*,
  332 F.3d 440 (7th Cir. 2003) ............................................................................................ 35

*United States v. Fassnacht*,
  No. 01 CR 63, 2002 WL 63523 (N.D. Ill. Jan. 15, 2002) ................................................... 70

*United States v. Feola*,
  420 U.S. 671 (1975) ......................................................................................................... 50

*United States v. Fine*,
  413 F. Supp. 740 (W.D. Wis. 1976) .................................................................................. 59

*United States v. Ford*,
  821 F.3d 63 (1st Cir. 2016) .............................................................................................. 37

*United States v. Foutz*,
  540 F.2d 733 (4th Cir. 1976) ............................................................................................ 30

*United States v. Gallegos*,
  No. 16-434-AKK-JEO, 2017 WL 2374800 (N.D. Ala. Apr. 13, 2017) ................................. 62

vi

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Giry*,
  818 F.2d 120 (1st Cir. 1987) ............................................................................ 51

*United States v. Gonzalez–Flores*,
  418 F.3d 1093 (9th Cir. 2005) ......................................................................... 31

*United States v. Gremillion-Stovall*,
  397 F. Supp. 2d 798 (M.D. La. 2005) .............................................................. 41

*United States v. Grenier*,
  513 F.3d 632 (6th Cir. 2008) ...................................................................... 40, 41

*United States v. Halper*,
  590 F.2d 422 (2d Cir. 1978) ............................................................................. 32

*United States v. Hang Le-Thy Tran*,
  433 F.3d 472 (6th Cir. 2006) ........................................................................... 30

*United States v. Hayes*,
  574 F.3d 460 (8th Cir. 2009) ........................................................................... 39

*United States v. Hillie*,
  227 F. Supp. 3d 57 (D.D.C. 2017) .............................................................. 36, 46

*United States v. Hinkle*,
  637 F.2d 1154 (7th Cir. 1981) ................................................................ 36, 45, 46

*United States v. Hitt*,
  249 F.3d 1010 (D.C. Cir. 2001) ....................................................... 35, 36, 40, 52

*United States v. Holland*,
  No. 17-cr-234 (N.D. Ga. Nov. 21, 2022) ........................................................ 70

*United States v. Hollingsworth*,
  27 F.3d 1196 (7th Cir. 1994) (en banc) .......................................................... 51

*United States v. Hubbard*,
  61 F.3d 1261 (7th Cir 1995) ............................................................................. 25

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Jackson,*
    918 F.3d 467 (6th Cir. 2019) ............................................................................... 33

*United States v. Jawara,*
    474 F.3d 565 (9th Cir. 2007) ................................................................. 23, 24, 26

*United States v. Jeffers,*
    570 F.3d 557 (4th Cir. 2009) ............................................................................... 55

*United States v. Jett,*
    No. 16-CR-1, 2017 WL 402154 (S.D. Ind. Jan. 30, 2017) .................................... 70

*United States v. LaSpina,*
    299 F.3d 165 (2d Cir. 2002) ............................................................................... 53

*United States v. Leavis,*
    853 F.2d 215 (4th Cir. 1998) ............................................................................... 55

*United States v. Little Dog,*
    398 F.3d 1032 (8th Cir. 2005) ............................................................................. 30

*United States v. Litwok,*
    678 F.3d 208 (2nd Cir. 2012) ............................................................................. 25

*United States v. Loughry,*
    660 F.3d 965 (7th Cir. 2011) ............................................................................... 31

*United States v. Lutz,*
    154 F.3d 581 (6th Cir. 1998) ............................................................................... 39

*United States v. Manafort,*
    Crim. Action No. 17-0201-01 (ABJ), 2018 WL 10394893 (D.D.C. June 12, 2018) ........... 62

*United States v. McDowell,*
    498 F.3d 308 (5th Cir. 2007) ......................................................................... 37, 39

*United States v. Meek,*
    No. 19-cr-378-JMS-MJD, 2020 WL 2218953 (S.D. Ind. May 7, 2020) ........................ 63, 66

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Meskin*,
   No. 21-cr-112 (C.D. Cal. Aug. 26, 2022) ................................................................ 69

*United States v. Michel*,
   No. 19-cr-148-CKK, 2019 WL 5797669 (D.D.C. Nov. 6, 2019) ............................ 66

*United States v. Montour*,
   944 F.2d 1019 (2d Cir. 1991) .................................................................................. 50

*United States v. Nance*,
   533 F.2d 699 (D.C. Cir. 1976) (per curiam) .......................................................... 44

*United States v. Nicely*,
   922 F.2d 850 (D.C. Cir. 1991) ................................................................................ 25

*United States v. Ohle*,
   678 F. Supp. 2d 215 (S.D.N.Y. 2010) .................................................................... 26

*United States v. Palfrey*,
   499 F. Supp. 2d 34 (D.D.C. 2007) .......................................................................... 61

*United States v. Pinckney*,
   85 F.3d 4 (2d Cir. 1996) ......................................................................................... 51

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018) .................................................................... 61

*United States v. Price*,
   951 F.2d 1028 (9th Cir. 1991) ................................................................................ 52

*United States v. Ramirez*,
   54 F. Supp. 2d 25 (D.D.C. 1999) ...................................................................... 62, 66

*United States v. Randazzo*,
   80 F.3d 623 (1st Cir. 1996) .................................................................................... 26

*United States v. Ranochak*,
   No. 17-cr-73 JD, 2022 WL 4115771 (N.D. Ind. Sept. 9, 2022) ............................ 69

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Redding*,
540 F. Supp. 2d 1184 (D. Kan. 2008) ............................................................... 66

*United States v. Risk,*
672 F. Supp. 346, 360 (S.D. Ind. 1987) ............................................................ 64

*United States v. Risk*,
843 F.2d 1059 (7th Cir. 1988) ............................................................... 3, 35, 64

*United States v. Robinson*,
855 F.3d 265 (4th Cir. 2017) ........................................................................... 55

*United States v. Rodriguez*,
2009 WL 1110415 (E.D. Wis. 2009) ............................................................... 66

*United States v. Rogers*,
617 F. Supp. 1024 (D. Colo. 1985) ............................................................ 60, 63

*United States v. Rose*,
590 F.2d 232 (7th Cir. 1978) ................................................................. 51, 52, 53

*United States v. Santiago*,
582 F.2d 1128 (7th Cir. 1978) .......................................................................... 69

*United States v. Shellef,*
507 F.3d 82 (2d Cir. 2007) ............................................................................... 33

*United States v. Smith*,
776 F.2d 1104 (3d Cir. 1985) ........................................................................... 59

*United States v. Sunia*,
643 F. Supp. 2d 51 (D.D.C. 2009) .............................................................. 45, 49

*United States v. Sykes*,
No. 17-cr-96, 2018 WL 3245205 (E.D. Wis. Feb. 2, 2018) ..................... 60, 65, 66

*United States v. Thomas*,
444 F.2d 919 (D.C. Cir. 1971) .................................................................... 45, 46

x

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

*United States v. Trie,*
   21 F. Supp. 2d 7 (D.D.C. 1998) ..................................................................... 61, 63

*United States v. Turner,*
   93 F.3d 276 (7th Cir. 1996) ............................................................................... 24

*United States v. Urbina,*
   No. 06-cr-336, 2007 WL 2220205 (E.D. Wis. 2007)............................................. 60

*United States v. Williams,*
   64 F. Supp. 2d 787 (C.D. Ill. 1999)..................................................................... 25

*United States v. Yashar,*
   166 F.3d 873 (7th Cir. 1999) ............................................................................. 42

*United States v. Yielding,*
   No. 4:08–CR–00213 BSM, 2008 WL 5114305 (E.D. Ark. Dec. 4, 2008) ............................ 62

*United States v. Young,*
   No. 98 CR 91 X 1, 2005 WL 2100975 (W.D. Wis. Aug. 30, 2005) ............................... 61, 62

*United States. v. Davis,*
   533 F.2d 921 (5th Cir. 1976) ......................................................................... 42, 53

*Will v. United States,*
   389 U.S. 90 (1967)............................................................................................. 60

**Statutes**

2 U.S.C. § 192 ..................................................................................................... 36

18 U.S.C. § 1001 ............................................................................................. *passim*

18 U.S.C. § 1349 ........................................................................................... 28, 29

18 U.S.C. § 1505 ............................................................................................. *passim*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

18 U.S.C. § 1519 ........................................................................................ *passim*

18 U.S.C. § 3282 .............................................................................................. 37, 40

18 U.S.C. § 371 ........................................................................................... *passim*

21 U.S.C. § 812 ...................................................................................................... 45

21 U.S.C. § 843 ...................................................................................................... 45

29 U.S.C. § 666 ................................................................................. 13, 28, 29, 49

42 U.S.C. § 7413 ...................................................................................................... 6

**Rules**

**Page(s)**

Fed. R. Crim. P. 12.................................................................... 22, 35, 50, 54

Fed. R. Crim. P. 14.................................................................... 22, 32, 33, 34

Fed. R. Crim. P. 7........................................................................................ 35, 58

Fed. R. Crim. P. 8.................................................................................... *passim*

Fed. R. Evid. 104.............................................................................................. 69

Fed. R. Evid. 801.................................................................................. 61, 68, 70

**Regulations**

Wis. Admin. Code Nat'l Res. § 406.075................................................... 6

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF AUTHORITIES — Continued**

**Page(s)**

**Books and Treatises**

ALI, Model Penal Code § 2.06 Comment (1985) ..................................................... 39

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 1A FED. PRAC. & PROC.
 CRIM. (5th ed., West 2022 update) ............................................................... *passim*

LaFave, *Substantive Criminal Law* (2003) ............................................................. 39

W. Clark & W. Marshall, Law of Crimes (2d ed. 1905) ......................................... 39


**Other Authorities**

*About Us*, FSSC,
 https://tinyurl.com/2p8btbe2 (last visited Dec. 18, 2022) ............................................. 15

*Our Products*, DIDION MILLING,
 https://tinyurl.com/y82cvb2s (last visited Dec. 17, 2022) ............................................... 5

Amy Pflugshaupt, *Finding a "new normal" one year after the
 explosion at Didion Milling*, NBC15 (May 31, 2018),
 https://tinyurl.com/yzmjjju8 ...................................................................................... 4

Amy Pflugshaupt, *Update on Didion Milling explosion survivor who lost
 both legs*, NBC15 (Nov. 10, 2017), https://tinyurl.com/5byk2p7d .................................... 4

Elizabeth Wadas, *Five years later, explosion survivor still
 enraged at Didion Milling Inc. leadership*, NBC15 (May 30, 2022),
 https://tinyurl.com/ymfmz7xv ................................................................................... 4

Press Release, *U.S. Dep't of Labor Proposes Over $1.8 Million in Fines
 Against a Wisconsin Corn Milling Facility After Fatal Grain Dust
 Explosion*, U.S. DEP'T OF LABOR, Nov. 17, 2017,
 https://tinyurl.com/4yy7y289 ................................................................................. 4, 5

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## INTRODUCTION

Sixteen months after Jim Lenz stopped working at Didion Milling, Inc., an explosion ripped through the mill. The explosion and ensuing fire killed five people, maiming and severely injuring twelve others. The only word for what happened that day is "horrific."

In the years that followed the explosion, investigators went through *every* aspect of Didion's operation and the Government brought the Indictment in this case. Following a nearly five-year-long investigation, the Government alleged that Didion willfully violated an OSHA regulation, which caused the wrongful deaths of five workers. That charge, a misdemeanor that could be brought against only the company, will consume two weeks of trial testimony and showcase the fire's carnage. In addition, the Government brought charges against six individual defendants, including James Lenz, for various crimes related to *other* aspects of the mill's operation. In particular, the Government focused its attention on Didion's recordkeeping practices in two types of logbooks—its baghouse logbooks, which record pressure readings to comply with environmental safety, and its Master Sanitation Schedule ("MSS") logbook, which record cleaning practices for workplace safety and food safety. The Indictment alleges that Lenz was involved only in crimes concerning the baghouse logs—namely, aiding and abetting a false statement (years after he left the company) and conspiring to make false statements and obstruct justice (again, years after he left the company).

1

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

There are various problems with these allegations, ranging from improper joinder of the wrongful death count (brought solely against the company) with the other counts (brought against the individuals) to failing to properly plead the § 1001 and § 371 counts against Lenz.  Collectively, this brief addresses the following flaws in the Indictment:

| *Motion* | *Description* |
|---|---|
| *First Pretrial Motion* | Motion to sever Count 2 |
| *Second Pretrial Motion* | Motion to dismiss Count 6 for:<br>• Failure to adequately plead the "intent" element of aiding and abetting liability<br>• Failure to allege a timely offense<br>• Unconstitutional vagueness<br>• Failure to adequately plead an offense, in part |
| *Third Pretrial Motion* | Motion to dismiss Count 4 for:<br>• Failure to adequately plead a single agreement<br>• Duplicity |
| *Fourth Pretrial Motion* | Motion for a bill of particulars identifying:<br>• Alleged unindicted co-conspirators<br>• Which of the 45,990 baghouse entries is materially false<br>• Which dates Lenz joined and withdrew from the conspiracy |
| *Fifth Pretrial Motion* | Motion to compel notice of purported co-conspirator statements and a *Santiago* proffer |

For each of these reasons, the case cannot be tried as indicted. This brief begins with a single factual background that undergirds each motion, then addresses the arguments cited above.

2

## FACTUAL BACKGROUND

This Court must assess the sufficiency of the Indictment on its face.[1] For that reason, the defense has treated the Indictment's allegations as true and recounts them as the factual background.[2] The defense also has sparingly supplemented the Indictment's allegations with other facts, as reported in public news accounts and the discovery, concerning the horrible injuries caused by the mill's explosion.

### A.    There was an explosion at Didion Milling, Inc., in late May 2017 that resulted in a terrible loss of life and prompted an investigation.

In the late hours of May 31, 2017, Didion Milling, Inc. ("Didion" or "DMI"), exploded.[3] In the course of its operations, combustible dust had accumulated on "the floors, walls, equipment, and overhead surfaces in many areas of DMI's facility."[4] That evening, a cloud of this dust had ignited, resulting in a "flash fire" called a "deflagration."[5] To anyone standing on the ground, this looked like a "fire ball" that "rapidly move[d] through and consume[d] the dust cloud."[6] But the fire ball didn't stay in one place. The "pressure waves" from the first explosion caused "new dust clouds" to form nearby and then ignite, resulting in "a succession of dust cloud explosions."[7] The growing fire ball

---

[1] *E.g.*, *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988).

[2] The Court granted the Government's motion to dismiss Count 3 of the Indictment and ordered it to file a Revised Indictment as a separate docket entry. R.27. The Government has filed neither a Revised Indictment nor a Superseding Indictment. Accordingly, all citations in this brief reference the still-operative Indictment, R.8.

[3] *See* R.8 ¶ 41.

[4] *Id.* ¶¶ 32, 40.

[5] *Id.* ¶ 31.

[6] *Id.*

[7] *Id.* ¶ 32.

3

tore through the mill, blowing the sides off three buildings and causing those and other nearby structures to collapse.[8]

The explosion shook the community. The blast was so strong that it sent many "running into the streets"; it knocked out the power, "and the only thing lighting up the night sky were the flames from the mill."[9] The town of Cambria watched "victims coming out of the rubble like the zombie apocalypse."[10] Five people were killed and a dozen others were severely injured.[11] Many who survived the explosion stayed in the mill to try to help their co-workers. One man recalled using "the dim light from a cell phone" to find two women in the rubble; another stayed with his co-worker while paramedics treated injuries that led to a double leg amputation.[12] Others now suffer from post-traumatic stress disorder after finding their co-worker burning alive, his polyester uniform "dripping off of [his] body."[13] The loss of life was devastating and its effects were long lasting.

The Occupational Safety and Health Administration ("OSHA") immediately began investigating the explosion. From June 1 through November 17, 2017, it interviewed hundreds of workers, took testimony from managerial staff, and worked with federal

---

[8] *Id.* ¶ 41.

[9] *See* Amy Pflugshaupt, *Finding a "new normal" one year after the explosion at Didion Milling*, NBC15 (May 31, 2018), https://tinyurl.com/yzmjjju8.

[10] *Id.*

[11] R.8 ¶ 42; Press Release, *U.S. Dep't of Labor Proposes Over $1.8 Million in Fines Against a Wisconsin Corn Milling Facility After Fatal Grain Dust Explosion*, U.S. DEP'T OF LABOR, Nov. 17, 2017, https://tinyurl.com/4yy7y289.

[12] Elizabeth Wadas, *Five years later, explosion survivor still enraged at Didion Milling Inc. leadership*, NBC15 (May 30, 2022), https://tinyurl.com/ymfmz7xv; Amy Pflugshaupt, *Update on Didion Milling explosion survivor who lost both legs*, NBC15 (Nov. 10, 2017), https://tinyurl.com/5byk2p7d.

[13] DM0034517 at DM0034518.

4

prosecutors to determine whether charges were warranted.[14] At the close of its investigation, OSHA proposed that Didion be fined more than $1.8 million on the theory that the explosion likely resulted from a willful failure to keep the mill sufficiently clean.[15] And, nearly five years after the explosion, prosecutors brought the charges in this case.

> **B.** **Before the explosion, Didion was regulated and monitored by two federal agencies, a state agency, and two third-party auditors.**

The regulations and oversight that Didion was subjected to before the explosion provide an important backdrop to the Indictment. Didion produces a variety of corn products, ranging from food ingredients to animal grain to biofuel.[16] It sells its products to an equally wide array of customers, including food and beverage manufacturers.[17] And, as just discussed, its milling process "generates large amounts of grain dust" that have to be "effectively managed."[18] As a result of the products it sells and the process that creates them, Didion was (and remains) subject to regulations that are aimed to ensure "food safety and qualify, workplace safety, and environmental" safety.[19]

To begin, Didion was subject to OSHA's workplace safety regulations.[20] Didion had to comply with OSHA's Grain Handling Standard, which is a federal regulation that aims "to prevent grain dust fires and explosions" by requiring mills to "develop and

---

[14] *See* R.8 ¶¶ 68–69, 71.
[15] *See id.* ¶ 67; Press Release, *supra* note 10.
[16] *See id.* ¶1; *see also Our Products*, DIDION MILLING, https://tinyurl.com/y82cvb2s (last visited Dec. 17, 2022).
[17] R.8 ¶¶ 1, 10.
[18] *Id.* ¶ 8.
[19] *Id.*
[20] *Id.* ¶ 33.

5

implement a written housekeeping program" specific to preventing deflagrations and to document its cleaning practices.[21]

Didion also was subject to oversight by the Environmental Protection Agency ("EPA"), and its environmental-safety regulations. Each State has to develop an EPA-approved plan to limit the amount of grain dust in the air.[22] Wisconsin's EPA-approved plan required, *inter alia*, that the Wisconsin Department of Natural Resources ("WDNR") regulate modifications or expansions of corn mills like Didion through construction permits.[23] Between 2000 and 2017, Didion sought and received several of these permits.[24] Although WDNR issued the permits and monitored compliance with them, the EPA could enforce the permits' terms, as well.[25]

The permits themselves imposed a variety of requirements on Didion. Most importantly, they required Didion to operate baghouses, which use suction to collect dust-laden air, pull it across filters to trap the dust, and then release the cleaned air outside the mill and into the environment.[26] The permits also required the mill to monitor the baghouses for pressure drops, which would indicate a malfunction in the baghouse; to submit a semi-annual monitoring report to WDNR that clearly documented "any deviations from permit conditions"; and to have a "responsible official" (someone with

---

[21] *See id.* ¶¶ 34, 36.
[22] *Id.* ¶¶ 53–55.
[23] *See id.* ¶¶ 55–56, 58.
[24] *Id.* ¶ 58.
[25] *Id.* ¶ 57; 42 U.S.C. § 7413(3); Wis. Admin. Code Nat'l Res. § 406.075.
[26] R.8 ¶ 59.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

decision-making authority) certify annually that Didion's records were accurate and provide a report detailing "deviations and violations."[27]

WDNR also independently monitored Didion. On May 17, 2017 (two weeks before the explosion), WDNR began investigating Didion's compliance with its permits.[28] WDNR agents came to the mill to inspect its facilities and papers.[29] In addition to the inspections, WDNR agents made subsequent records requests.[30] The WDNR investigation ended November 10, 2017.[31]

Apart from the WDNR's 2017 investigation, Didion also was subject to two audits. First, by court order, it was monitored by a third-party environmental compliance auditor from 2010 to 2015.[32] Each year, the auditor produced a report that described any violations it uncovered and any corrective action already taken or proposed.[33] Didion had to provide each audit report to the WDNR.[34] Second, in 2013, Didion obtained a Food Safety System Certification 22000 ("FSSC 22000") and became subject to annual third-party food-safety audits in order to keep that certification.[35] Each year since then, the auditor came to Didion to perform "a thorough inspection of the facility" and review its

---

[27] *See id.* ¶¶ 60–61, 63–64.
[28] R.8 ¶ 66.
[29] *Id.* ¶¶ 66, 105.
[30] *Id.* ¶¶ 66, 110.
[31] *Id.* ¶ 66.
[32] *Id.* ¶ 65.
[33] *Id.*
[34] *Id.*
[35] *Id.* ¶¶ 18–19.

7

cleaning practices.[36] Each inspection generated a report that recommended whether to continue its FSSC 22000.[37]

Collectively, this web of regulations and regulators meant that, between 2010 and 2017, Didion had obligations to six different entities. Further, the regulations and responsibilities they generated aimed to prophylactically combat three distinct issues: workplace safety, environmental safety, and food safety. Here is how it broke down:

| Regulating Entity | Didion's Obligation | Reason |
|---|---|---|
| OSHA | Comply with the Grain Handling Standard by developing a protocol to keep the mill sufficiently clean of dust | Workplace safety |
| EPA | Comply with WDNR-issued permits | Environmental safety |
| WDNR | Comply with the permits:<br>• Operate baghouses within prescribed pressure ranges;<br>• Submit semi-annual monitor reports; and<br>• Submit annual certifications of compliance and deviation summary reports, signed by responsible official<br>Comply with on-site visits and record requests as part of WDNR's investigation | Environmental safety |
| Court | Comply with 5-year monitorship by environmental auditor and give auditor's annual reports to WDNR | Environmental safety |
| Environmental auditor | Provide records to auditor for purposes of writing annual report | Environmental safety |
| Food safety auditor | Comply with annual facility inspection and records review in order to maintain FSSC 22000 | Food safety |

---

[36] *Id.* ¶ 19.
[37] *Id.* ¶ 20.

8

C.    **Didion used two separate logbooks to comply with its workplace safety, food safety, and environmental safety obligations.**

The mill documents its day-to-day operations through two recordkeeping practices that are at the heart of this case. To track the level of grain dust in the mill, in connection with workplace and food safety concerns, Didion maintains a Master Sanitation System logbook ("MSS log").[38] Separately, to monitor the pressure of the dust-laden air inside the baghouses, in connection with environmental safety concerns, Didion maintains a baghouse logbook ("baghouse log").

1.    **The MSS log tracks workplace conditions at the mill, in order to meet Didion's food safety and workplace safety obligations.**

Didion relied on the MSS procedures to keep its mill free of fires and its food products free of insects, molds, and other contaminants.[39] The protocol demanded dozens of cleanings at set frequencies, some as often as twice per day.[40] Relevant here, it demanded that mill workers inspect, clean, and sanitize specific pieces of processing equipment.[41] And it demanded that workers remove grain dust from the mill's floors, equipment, and overhead areas.[42]

Didion tracked these efforts in a physical logbook.[43] The MSS log listed each required cleaning and the specific deadline for that cleaning, with blank space left for workers to initial and date.[44] It contained spaces for three signatures: the worker who

---

[38] *Id.* ¶ 12.
[39] *Id.* ¶¶ 11–13, 37.
[40] *Id.* ¶ 13.
[41] *Id.*
[42] *Id.*
[43] *Id.* ¶ 52.
[44] *Id.* ¶ 14.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

completed the cleaning, a shift superintendent who verified that that cleaning occurred, and a food-safety superintendent who certified that sanitation procedures had been followed.[45] The MSS procedures did not permit backdating.[46]

### 2. The baghouse logs track pressure readings, in order to meet Didion's environmental safety obligations.

Didion kept a separate, electronic logbook to document its compliance with the WDNR permits. Didion had 14 baghouses at its facility.[47] Workers were responsible for tracking the pressure inside each baghouse three times per day (once every eight hours) and contemporaneously recording the pressure.[48] This meant that there should be 42 entries in the baghouse log each day.[49] The entries identified the length of the water column inside the bag; for example, a "5" indicated 5 "inches of water column."[50] If the pressure exceeded what the permit allowed, then Didion employees had to correct it.[51] There was a separate baghouse log for each month of the year.[52]

---

[45] *Id.* ¶ 15.
[46] *Id.* ¶ 13.
[47] *Id.* ¶ 61.
[48] *Id.*
[49] *Id.*
[50] *Cf. id.* ¶ 62.
[51] *Id.* ¶ 61.
[52] *See, e.g., id.* ¶ 90 (describing "December 2015" baghouse log).

10

### D.   In the course of investigating the explosion, the Government became concerned that the MSS and baghouse logs weren't accurate.

While trying to determine the explosion's cause, federal investigators became suspicious that Didion employees had not accurately recorded their cleaning practices in the MSS log or the pressure readings in the baghouse log.

As to the MSS logbook, the Government surmised that cleanings were not completed on the dates listed. Rather, it believed, Didion employees intentionally backfilled blank entries in the logbook to suggest cleanings had been completed on dates when they had not, then submitted the filled-in logbook to OSHA and the food-safety auditors so that Didion could maintain its operations, its FSSC certification, and, in turn, its customers.[53] Although two employees, Derrick Clark and Anthony Hess, testified under oath to OSHA that the log was not backfilled, the Government thought that they had lied.[54]

The Government also became concerned that pressure readings in the baghouse logbook had been falsified. In light of the consistent number of "2" and "8" entries, the Government hypothesized that workers routinely entered those numbers anytime that the actual measurement was outside the range allowed by the WDNR permit or when no measurement had been taken, backfilling blank entries.[55] This meant that Didion employees had presented false records to the court-ordered environmental compliance auditor.[56] And the auditor, in turn, had produced an inaccurate audit report based on that

---

[53] *E.g., id.* ¶¶ 25, 27, 39, 52.
[54] *E.g., id.* ¶¶ 69–72, 111–13.
[55] *Id.* ¶¶ 62, 90–92.
[56] *Id.* ¶¶ 63, 65, 79.

incomplete and false baghouse logbook, which Didion employees delivered to WDNR.[57] And, the Government now believed, Didion employees had made direct misrepresentations to WDNR when they filed their annual certifications of compliance and deviation summary reports, as well as when they submitted the baghouse logs to WDNR as part of its own investigation of Didion's permit compliance.[58]

### E.  The Government indicted Didion and six individuals, including Lenz.

On May 11, 2022, a grand jury returned a nine-count indictment against Didion and six individuals. Following the Government's dismissal of Count 3, only one charge (Count 2) pertains to the explosion; the remaining charges (Counts 1 and 4–9) purport to allege conspiracies to violate and substantive violations of federal wire fraud and obstruction laws. Further, none of the six indicted individuals is a corporate executive. Rather, the Government charged the corporation and its vice president of operations, a food safety superintendent, an environmental manager and part-time consultant, an environmental coordinator, and two day-shift superintendents.[59]

Jim Lenz was one of the six individuals indicted. He served as Didion's environmental manager from roughly June 2011 to April 2016.[60] While in that role, he monitored Didion's compliance with its WDNR permits and interacted with the environmental auditor and WDNR inspectors.[61] In April 2016, he left the company and "began part-time

---

[57] *Id.* ¶¶ 65, 80.
[58] *Id.* ¶¶ 66, 81–82.
[59] *See id.* ¶¶ 1–7.
[60] *Id.* ¶ 4.
[61] *Id.*

12

work as an environmental consultant."[62] Although he consulted for Didion, the Indictment doesn't describe the time period during which he did so or his activities or responsibilities as a part-time consultant.[63]

Neither Lenz nor any other individual is charged in Count 2—again, the sole count pertaining to the explosion and deaths of five workers. That count alleges that Didion willfully violated OSHA's Grain Handling Standard, in violation of 29 U.S.C. § 666(e), because it didn't "develop a written housekeeping program that was specifically dedicated to preventing combustible dust fires and explosions."[64] Instead, Didion relied on the MSS procedures, which were aimed at food safety and which Didion supposedly knew was insufficient to meet its workplace safety obligations; as a result, the mill exploded and five employees died.[65] The § 666(e) charge is a misdemeanor, and it can be brought only against an "employer."[66]

The two counts in which Lenz *is* charged are premised on conduct that purportedly occurred both while he was at Didion and after he left the company. In Count 4, the Indictment purports to allege that he was a member of a single conspiracy that existed from March 25, 2013, while he was a Didion employee, through February 8, 2018—years after he had left Didion's full-time employment.[67] And, in Count 6, he is charged with

---

[62] *Id.*

[63] *Cf. id.*

[64] *Id.* ¶ 37.

[65] *Id.* ¶¶ 38–42.

[66] 29 U.S.C. § 666(e) (maximum punishment for first violation is six months and $10,000 fine; maximum punishment for successive violation is 12 months and $20,000 fine).

[67] R.8 ¶ 73.

13

aiding and abetting his co-worker, Joseph Winch, in submitting a materially false statement to WDNR in mid-August 2017—again, well over a year after he was no longer a full-time employee.[68]

### 1.    Count 4 purports to allege that Lenz, Didion, and others joined in a single conspiracy, but it actually alleges two distinct agreements.

In Count 4, the Indictment purports to allege that Didion and all six individual defendants conspired to violate three federal laws. Specifically, it contends, there was an agreement to: make and use a false writing and document in OSHA and EPA matters, which would violate 18 U.S.C. § 1001(a)(3); to falsify documents in connection with OSHA and EPA matters, in violation of 18 U.S.C. § 1519; and to obstruct OSHA's investigation, in violation of 18 U.S.C. § 1505.[69]

But, as explained more fully below, Count 4 actually alleges two separate agreements. Each illegal agreement revolves around some group of participants' efforts to falsify a logbook. But each involves a different logbook, a different time period, a different set of conspirators, a different regulating entity, and a different obligation. And there is no overarching allegation that merges the two agreements into a single overarching scheme.

First, the Indictment alleges that five defendants agreed to falsify the MSS log. They did so in order to obstruct OSHA's post-explosion investigation of Didion's

---

[68] *Id.* ¶ 122.
[69] *Id.* ¶ 73.

14

workplace conditions, from June 1 through November 10, 2017, in violation of § 1505.[70] Specifically, the Indictment alleges, "DMI, Clark, Messner, Hess, Niemeyer, and others working with them and at their direction caused false entries to be made in the MSS log-book," which Didion then submitted to OSHA and about which Clark and Hess gave false testimony to OSHA.[71] Several defendants committed overt acts in furtherance of this conspiracy when they sent emails directing others to backfill blank entries in the MSS log, backfilled blank entries, and signed off on the log knowing it had false entries.[72]

Second, and separately, the Indictment alleges that six defendants agreed to falsify the baghouse log. They did so to help Didion pass its environmental compliance audit, from 2010 through 2015, and then to obstruct WDNR's pre-explosion permit-compliance investigation, from May 17 through November 10, 2017, all in violation of §§ 1001(a)(3) and 1519. Specifically, the Indictment alleges "that DMI, Clark, Lenz, Hess, Niemeyer, and others working with them and at their direction falsified the pressure drop entries in the baghouse log," which "DMI, Clark, and Lenz presented . . . to the third-party environmental auditor" and "WDNR inspectors."[73] Further, "DMI, Clark, Lenz, and Winch

---

[70] Some backfilling of entries allegedly was intended to prevent food safety auditors from seeing blank entries, so that Didion could maintain its FSSC 22000 and customers, but that objective (if completed) wouldn't trigger liability under §§ 1001(a)(3), 1505, or 1519. *See id.* ¶¶ 87, 93. Each of those statutes concerns obstruction of a federal proceeding, federal investigation, or other matter within a federal entity's jurisdiction. *See* 18 U.S.C. §§ 1001(a)(3), 1505, 1519. But FSSC 22000 is a global non-profit entity based in the Netherlands, with no alleged connection to a federal entity. *See About Us*, FSSC, https://tinyurl.com/2p8btbe2 (last visited Dec. 18, 2022). Therefore, a conspiracy to obstruct the food safety auditor's work on Didion's FSSC 22000 certificate would not state an offense.

[71] R.8 ¶¶ 76–77, 83, 111–13. Throughout this brief, all-caps capitalization has been removed from the defendants' names for ease of reading.

[72] *Id.* ¶¶ 86–88, 93–100, 102–04, 106–07.

[73] *Id.* ¶¶ 78–81.

15

filed false certifications of compliance and deviation summary reports with WDNR that intentionally omitted" reference to the falsified baghouse log.[74] Several defendants committed overt acts in furtherance of this conspiracy when they asked others to backfill blank entries in the baghouse log, provided falsified baghouse logs to the auditor or WDNR, and certified to WDNR that Didion had complied with the baghouse monitoring requirements for its permits.[75]

Broken out visually, the conspiracies plainly operate independent of one another. Their participants are not even coextensive:



Lenz's purported conduct is confined to this second conspiracy. The Indictment makes only a handful of specific allegations. First, on March 25, 2013, Lenz allegedly emailed the mill managers about an upcoming meeting with the environmental compliance auditor and asked that "the records be brought up to date" before he printed them

---

[74] *See id.* ¶ 82.
[75] *Id.* ¶¶ 85, 89–92, 101, 105, 108–10, 114–15.

16

out for the auditor's review.[76] Second, on April 16, 2015, he allegedly submitted the auditor's report, which was prepared based on false baghouse log entries, to WDNR.[77] And then, on February 12, 2016, and March 14, 2016, he allegedly sent emails identifying blank entries in the December 2015, February 2016, and March 2016 baghouse logs and directing others to fill them in.[78] The latest-in-time conduct that the Indictment alleges Lenz took was sending that email on March 14, 2016—more than six years before the Indictment was returned.

The two agreements are necessarily separate from one another. They center on efforts to falsify distinct logbooks that served distinct purposes. There is no allegation that all seven defendants conspired to falsify both logbooks as part of an overarching scheme. Indeed, there's no allegation, for example, that Lenz or Winch agreed to obstruct the OSHA investigation. In fact, the allegations are that Lenz had *nothing* to do with the MSS log. He was an environmental manager focused on environmental compliance and interacting with WDNR, not documenting sanitation cleanings and interfacing with OSHA. Each of the two conspiracy agreements in Count 4, then, plainly pertains to a distinct subset of employees' purported efforts to falsify *different* documents for review by *different* entities for *different* purposes, during *different* time periods.

---

[76] *Id.* ¶ 85.
[77] *Id.* ¶ 89.
[78] *Id.* ¶¶ 90–91.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### 2. Count 6 purports to allege that Lenz aided Winch in submitting false statements to WDNR, triggering liability under § 1001(a)(3).

In addition to the baghouse-log conspiracy, Lenz is charged with substantively violating § 1001(a)(3) in mid-August 2017, almost eighteen months after he left the company. According to the Indictment, on "August 16, 2017, WINCH sent to WDNR the baghouse logs for 2015, 2016, and 2017, which contained thousands of false pressure drop entries."[79] And *one* of those false statements was material—the logs "contain[ed] *a* materially false, fictitious, and fraudulent statement and entry."[80] Further, cross-referencing earlier paragraphs, the Indictment alleges that, by submitting the baghouse logs to WDNR, Winch was making a purportedly false statement in a "matter[] within the jurisdiction of the EPA."[81] The Indictment doesn't incorporate by reference any paragraph concerning Lenz.

But, reading the Indictment as a whole, the Government's theory towards Lenz appears to rest on aiding-and-abetting liability. Specifically, the Indictment suggests that Lenz aided and abetted Winch in making a false statement to WDNR because, in February and March 2016, Lenz directed subordinates to backfill blank baghouse log entries for 2015 and 2016, and then, eighteen months later, Winch submitted those logs to WDNR as part of WDNR's permit-compliance review.[82]

---

[79] *Id.* ¶ 121.
[80] *Id.* ¶ 122.
[81] *Id.* ¶¶ 120–22.
[82] *Id.* ¶¶ 121–22.

18

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Beyond that boilerplate, the charge is silent. The Indictment makes no allegation that Lenz had any interaction with the baghouse logs between March 2016 and their submission to WDNR, in mid-August 2017. It leaves the reader to guess whether Lenz even intended Winch to give the baghouse logs to WDNR at that later date. And, critically, nowhere in Count 6 (or elsewhere) does the Indictment identify which of the tens of thousands of baghouse entries purportedly was materially false, giving rise to federal criminal liability.

### F.    Information that Lenz needs to investigate the case, prepare a defense, and avoid unfair surprise at trial is missing from the Indictment.

Despite the Indictment's length, key details are missing from it. In particular, three categories of information are omitted: the time period during which Lenz purportedly conspired to violate the law, the unindicted "others" with whom he conspired, and which baghouse log entry was materially false.

First, the Indictment alleges two broad conspiracies in Count 4, but it leaves unclear the time period when Lenz supposedly was involved in one of those two conspiracies. According to the allegations, Lenz and at least five other individuals, plus Didion, conspired to violate three federal laws "beginning on a date unknown to the Grand Jury but not later than on or about March 25, 2013, and continuing through a date unknown to the Grand Jury but at least through on or about February 8, 2018."[83] At no point does the Indictment allege when during that five-year period Lenz joined the conspiracy or withdrew from it. Meanwhile, it *does* allege that Lenz wasn't a Didion employee for that

---

[83] *Id.* ¶¶ 73–74.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

entire timeframe; he left the company in April 2016 and served as a part-time consultant at some point (the Indictment doesn't allege when or for how long).[84] Thus, it's unclear from the face of the Indictment whether the Government is alleging that Lenz was a co-conspirator for the entire length of the conspiracy or just some part of it.

Second, the Indictment refers to "other" unindicted co-conspirators, but it doesn't identify those individuals. After identifying the named defendant co-conspirators, the Indictment goes on to explain the "manner and means" of the conspiracy through allegations that the defendants "and others working with them and at their direction" conspired.[85] And, it alleges multiple purported "overt acts" in which one individual sent an email to named co-conspirators and "others."[86] At no point does the Indictment describe these "other" participants. Meanwhile, the number of potential "other" unindicted co-conspirators is voluminous. The Government could claim that any mill employee who falsely recorded a pressure reading in a baghouse log for any month in 2015, 2016, or 2017 might be an unindicted co-conspirator, and the mill employees dozens of workers.

And, third, as just noted, the Indictment leaves ambiguous *which* baghouse log entry is purportedly materially false. According to the Indictment, there are 45,990 potentially false entries across these logs—one entry every eight hours, for each of 14 baghouses, over three years.[87] Any of those 45,990 statements could be the one on which liability turns. But, when it comes to Count 6's allegations that Lenz violated § 1001(a)(3),

---

[84] *Id.* ¶ 4.
[85] *Id.* ¶¶ 75, 76, 78.
[86] *Id.* ¶¶ 87, 90–95, 102, 106.
[87] *See id.* ¶¶ 61, 121–22.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the Indictment doesn't identify *which* statement the grand jury found was materially false. Instead, it alleges only that "the baghouse logs for 2015, 2016, and 2017 . . . contained *thousands* of false pressure drop entries" and that Lenz aided and abetted Winch in submitting those logs to WDNR, knowing that they "contain[ed] *a* materially false, fictitious, and fraudulent statement and entry."[88]

The discovery doesn't fill-in the gap. As of this filing, the Government has produced approximately 1.1 terabytes of data. Moving beyond bytes, that equates to 316,325 files, totaling more than 1.3 million pages. Undersigned counsel are in the course of reviewing these materials. But the extent of their review won't matter. No amount of review will permit the defense to identify the dates on which the Government believes Lenz joined or withdrew from the conspiracy or those individuals who the Government believes are unindicted co-conspirators. Nor will its review lead the defense to learn which baghouse log entry the grand jury believed was materially false or which the Government will contend at trial is the one the grand jury believed was materially false.

The defense reached out to the Government in advance of this filing to see if it would provide that missing information. It declined. The Government explained that the defense "should have no trouble gleaning this information from the indictment, let alone, the discovery."[89] As explained below, the Government is mistaken.

---

[88] *Id.* ¶¶ 121–22 (emphases added).
[89] Email from R. Powers to J. Ettinger, Dec. 12, 2022 (on file with counsel).

21

## ARGUMENTS IN SUPPORT OF PRETRIAL MOTIONS

**I.     First Pretrial Motion: Count 2 should be severed from the rest of the Counts and tried separately.**

When it comes to joining and severing counts, Rules 8 and 14 control. Under Rule 8(a), the Government can join counts in one indictment when the counts "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."[90] Upon proper motion, under Rules 8 and 12(b)(3)(B)(iv), a court must sever a count that is improperly joined.[91] And, similarly, under Rules 12(b)(3)(D) and 14, the Court can sever counts, even if properly joined under Rule 8, if the joinder would prejudice the defendant.[92]

Here, Count 2 cannot be tried with the other counts in the Indictment. It is misjoined with the other Counts, because it is not of the same or similar character to any other charge. And even if properly joined, the Court should exercise its discretion to require the Government to try it separately. Lenz will be severely prejudiced if forced to defend against his white-collar obstruction charges while the corporation is tried for willfully causing the horrific deaths of five fellow employees.

---

[90] Fed. R. Crim. P. 8(a).
[91] Fed. R. Crim. P. 8(a), 12(b)(3)(B)(iv).
[92] Fed. R. Crim. P. 12(b)(3)(D), 14; *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 1A FED. PRAC. & PROC. CRIM. § 141 (5th ed., West 2022 update).

22

### A. Under Rule 8(a), Count 2 can't be joined with the rest of the Counts in the Indictment.

When deciding whether separate charges can be joined together in a single indictment, courts employ a categorical analysis.[93] If the offenses are of the same or similar character, then they can be joined; if they are not, then they must be severed.[94] As set out below, Count 2 is dissimilar from every other Count in the Indictment; it is *not* "of the same or similar character."

As a quick aside: there are two other scenarios that allow for offenses to be joined under Rule 8(a), but neither is applicable here. These include when the offenses are "based on the same act or transaction or on two or more acts or transactions connected together or constituting part of a common scheme or plan."[95] The Indictment doesn't allege a transaction, series of transactions, scheme, or other piecemeal process that connects Count 2 to another Count. Count 2 is premised on Didion's failure to develop and implement a housekeeping program, separate from the MSS, which constituted a violation of a specific OSHA regulation and resulted in the deaths of its employees. Although Count 1 alleges that Didion failed to abide by its MSS protocol, that Count's wire fraud theory concerns Didion's intent to fraudulently maintain its FSSC 22000 and defraud its customers. The remaining Counts (Counts 4 through 9) allege obstruction charges arising from Didion employees falsifying the MSS log and baghouse logs, then giving false testimony

---

[93] *United States v. Alexander*, 135 F.3d 470, 476 (7th Cir. 1998); *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994).
[94] *United States v. Jawara*, 474 F.3d 565, 573 (9th Cir. 2007); *see also* WRIGHT & MILLER §§ 141–42.
[95] Fed. R. Crim. P. 8(a).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

about the same. By the nature of the charged offenses, then, there is no overlapping act or transaction, or a series of the same, connecting Count 2 to any other Count. So, this brief will focus only on the broadest category for joinder under Rule 8(a)—whether the offenses are of the same or similar character.[96]

As set out below, in evaluating the counts in this Indictment for misjoinder, the Court must focus upon the allegations themselves. Upon doing so, it's plain that Count 2 can't be tried alongside the other Counts.

### 1.    Rule 8(a)'s "of the same or similar character" test for joinder focuses on an indictment's allegations.

There is no single test for whether charges concern the "same or similar character."[97] Instead courts look at several factors, including whether the counts "are of like class."[98] And that usually boils down to whether they involve "closely related statutory prohibitions."[99] As one court observed: "The offenses need not be of identical statutory origin in order to be *similar*, but their correspondence in type is obviously central to their proper joinder on this ground."[100] The Seventh Circuit has given a clear illustration of when crimes should be joined and when they should not: "Two armored car robberies committed months apart are offenses of same or similar character; possessing five kilograms of cocaine and defrauding a bank, even if they occur on the same day, are not."[101]

---

[96] *Alexander*, 135 F.3d at 476.

[97] Fed. R. Crim. P. 8(a); *Jawara,* 474 F.3d at 576; *see also* WRIGHT & MILLER § 144 (noting the lack of "criteria which would provide guidance as to the precise scope of this rule").

[98] *Alexander*, 135 F.3d at 475–76; *United States v. Turner*, 93 F.3d 276, 283 (7th Cir. 1996); *see also* WRIGHT & MILLER §§ 141, 143.

[99] *Turner*, 93 F.3d at 283

[100] *Coleman*, 22 F.3d at 133 n.10.

[101] *Id.* at 133.

24

In short, it's the nature of the conduct alleged, not exclusively the timing of that conduct, that guides Rule 8(a)'s inquiry.

Following that example, courts have focused on the face of the indictment and articulated several helpful guideposts for determining when charges can't be joined. For instance, the Seventh Circuit has explained, when nothing tied the distribution of drugs to the possession of firearms, the offenses are "wholly distinct" and the counts had to be severed.[102] Likewise, a district court in this Circuit held, possession of crack could not be joined with false statements on a passport.[103] In each instance, the conduct in one charge was different in kind from the conduct in the misjoined charge.

Critically, the distinction between guns and drugs and drugs and passports aren't the only times courts have noted that two charges are improperly joined. The Second Circuit has held that joining a mail fraud charge (related to a fraudulent home insurance claim) and a tax evasion charge against a defendant was not proper.[104] And the D.C. Circuit has held that a conspiracy to defraud and conspiracy to violate federal currency reporting laws could not be joined together, noting it was a "tenuous connection suggested prior to trial whose flimsiness became stark when put to the test at trial in connection with money laundering scheme."[105] And a defendant's alleged personal tax evasion was

---

[102] *United States v. Hubbard*, 61 F.3d 1261, 1270–71 (7th Cir 1995).
[103] *United States v. Williams*, 64 F. Supp. 2d 787, 789–90 (C.D. Ill. 1999).
[104] *United States v. Litwok*, 678 F.3d 208, 217 (2nd Cir. 2012).
[105] *United States v. Nicely*, 922 F.2d 850, 854 (quote), 854–55 (holding) (D.C. Cir. 1991).

25

not sufficiently related to the alleged conspiracy to develop and implement fraudulent tax shelters to have the counts tried together.[106]

All these examples teach that, under Rule 8(a), courts must scrutinize the indictment and make sure that the charges are of the same or similar character based on the allegations presented. It's not enough that both charges involve drugs or guns or both charges involve white-collar offenses — "a vague thematic connection cannot, in itself, justify joinder."[107] As one court noted, rejecting high generalities of abstraction: "whatever the rationale, we think that it is very hard to describe adulterating or mislabeling shrimp as offenses 'similar' to tax fraud — except at a level of generality so high as to drain the term of any real content."[108] Instead, offenses are properly joined when the conduct alleged is characteristically similar.

> **2.   There is no elemental or factual overlap between Count 2 and the other Counts in the Indictment.**

The case against Lenz and the other individual defendants is the normal white-collar case. Between 2013 and 2017, the Government alleges, the individual defendants committed a bevy of crimes centered around theories of fraud, conspiracy, false statements, and obstruction of justice. They break down this way:

---

[106] *United States v. Ohle*, 678 F. Supp. 2d 215, 224, 227 (S.D.N.Y. 2010).
[107] *Jawara*, 474 F.3d at 578–79.
[108] *United States v. Randazzo,* 80 F.3d 623, 628 (1st Cir. 1996).

| Count | Charges | Defendant(s) |
|---|---|---|
| 1 | Fraud Conspiracy, 18 U.S.C. § 1349 | Didion, Clark, Mesner, Hess, and Niemeyer |
| 2 | OSHA Violation Causing Death, 29 U.S.C. § 666(e) | Didion |
| ~~3~~ | ~~OSHA Violation Causing Death, 29 U.S.C. § 666~~ | ~~Didion~~[109] |
| 4 | Conspiracy, 18 U.S.C. § 371 | Didion, Clark, Mesner, Lenz, Winch, Hess, and Niemeyer |
| 5 | Document Falsification in Contemplation of Federal Investigation, 18 U.S.C. §§ 1519, 2 | Didion, Clark, and Winch |
| 6 | False Entries in Record Within EPA's Jurisdiction 18 U.S.C. § 1001(a)(3) & 2 | Didion, Clark, Lenz, Winch, Hess, and Niemeyer |
| 7 | False Entries in Record within OSHA's Jurisdiction 18 U.S.C. § 1001(a)(3) & 2 | Didion Clark, Mesner, Hess, and Niemeyer |
| 8 | Obstruction, 18, U.S.C. § 1505 | Hess |
| 9 | Obstruction, 18, U.S.C. § 1505 | Didion and Clark |

The charges against the individuals all center on different theories of dishonesty—namely, fraud or a false statement or obstruction of justice. They all are of the same or similar character; they can be charged and tried together.[110] Count 2 is different—not merely in degree but in kind. Count 2 alleges the willful violation of an OSHA regulation that led to the death of five individuals. It is the outlier.

To begin, Count 2 is topically distinct from Counts 1 and 4–9. Counts 1 and 4 are conspiracy counts, focused on an illicit meeting of the minds to violate federal wire fraud, false statement, and obstruction laws. Counts 6 and 7 allege substantive false statements

---

[109] Count 3 was dismissed on the Government's motion. R.27.
[110] *See* Fed. R. Crim. P. 8(a).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

offenses. And Counts 8 and 9 allege substantive obstruction of justice offenses. As such, Counts 1 and 4–9 all center on criminal dishonesty, in some form. And those charges all arise out of the same or similar sections of the criminal code. Yet, Count 2 doesn't concern dishonesty; it concerns the failure to maintain a housekeeping procedure for cleaning the mill that is focused specifically on workplace safety, rather than food safety, and the resulting deaths of employees. And its offense arises under an entirely different Title of the Code—Title 29, the labor regulations governing the United States. And Count 2 can only be brought against the corporation.[111]

Not surprisingly, then, the legal demands for Count 2 are distinct from the questions at issue in the other counts. The *actus reus* for Count 2 is different from that of the other Counts. Count 2 alleges a violation of § 666(e), which requires the Government to prove that an employer violated an OSHA regulation and that that violation caused an employee's death. In contrast, the other Counts charge offenses that have different demands. Counts 1 and 4 charge conspiracy offenses under §§ 1349 and 371, respectively, each of which demands that the Government prove that there existed an illegal agreement among the defendants charged. Count 5 charges three defendants with obstruction through the falsification of records, in violation of § 1519, which demands that the Government prove the defendants made false entries in a document to impede an investigation. Counts 6 and 7 charge false-statement offenses, in violation of § 1001, which demand that the Government prove the defendants made or used a false statement. And Counts

---

[111] *See United States v. Doig*, 950 F.2d 411, 413 (7th Cir. 1991).

28

8 and 9 charge obstruction offenses, in violation of § 1505, which demands that the Government prove the defendants obstructed an agency proceeding.

Likewise, the *mens rea* for Count 2's offense is different from that needed to prove the offenses charged in the other Counts. Section 666(e) requires that the Government prove the employer "willfully" violated an OSHA standard. In contrast, the offense charged in Counts 1, 4, and 5 (§§ 1349, 371, and 1519, respectively) demand proof that the defendant acted "knowingly"; Counts 6 and 7's offenses (§ 1001(a)(3)) demand proof of a "knowing and willful" violation; and Counts 8 and 9 charge offenses (§ 1505) that demand proof that the defendant acted "corruptly."

Nor is there any overlap between the factual allegations that underpin Count 2 and the factual allegations that support the other charges. Count 2 arises from the corporation's purported failure to develop a separate protocol aimed at preventing deflagrations, contrary to OSHA requirements. Meanwhile, Counts 1 and 4–9 concern inchoate and substantive violations of fraud, false statement, and obstruction laws arising from allegations that Didion employees falsified the MSS log and baghouse log entries before submitting those same logs, or giving testimony about them, in matters over which federal agencies had jurisdiction.

In sum, Count 2 is distinct from the rest of the Indictment. The offense it charges is topically dissimilar from the offenses charged in all the other Counts. The *actus reus* and *mens rea* elements of the charge in Count 2 don't line up with the elements of any other charged offense. And, it follows, the factual allegations that support Count 2 are

29

dissimilar from the allegations that underpin Counts 1 and 4–9. Simply put, Count 2 is not of the same character as the other offenses and, thus, cannot be joined under Rule 8.

### 3. Beyond a categorical analysis of elements and allegations, the evidence supporting Count 2 would not come in for the other Counts.

Beyond looking strictly at the indictment, courts also consider the realities of what a trial on two joined offenses would look like in deciding whether their "character" is similar.[112] The rationale being: if the evidence from the challenged count couldn't come in for the other counts, the two charges are probably not of a same or similar character.[113] The lack of evidentiary overlap is a point that *many* courts have found dispositive in granting severance.[114] As the Fourth Circuit has observed: "When evidence of one offense would not be admissible at a separate trial for the other, the saving of time effected by a joint trial is minimal. '*Thus, the only real convenience served by permitting joint trial of unrelated offenses against the wishes of the defendant may be the convenience of the prosecution in securing a conviction*.'"[115]

Here, the evidence that will support Count 2 doesn't overlap with the evidence that would support the other charges. The evidence pertaining to Count 2 will consist of scientific evidence about deflagration and the explosion's cause and origin, as well as testimony from the deceased individuals' family members, co-workers who struggled to

---

[112] *See* WRIGHT & MILLER § 144; *see United States v. Hang Le-Thy Tran*, 433 F.3d 472, 478–79 (6th Cir. 2006); *see also United States v. Little Dog*, 398 F.3d 1032, 1037 (8th Cir. 2005).

[113] *See* WRIGHT & MILLER § 144

[114] *See* WRIGHT & MILLER § 114 n.22 (collecting cases).

[115] *United States v. Foutz*, 540 F.2d 733, 738 (4th Cir. 1976) (emphasis added).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

find one another in the rubble and still suffer from PTSD, and images of dead bodies and dismembered body parts. It's evidence that would never be admissible at the individual defendants' trial on white-collar fraud and obstruction offenses, legally disconnected from any worker's death. The workers' deaths, and who's to blame for those deaths, has no bearing on whether the baghouse log or MSS log was falsified in a way that creates federal criminal liability. That highly inflammatory evidence would not be relevant to any question on those Counts, and it would severely prejudice Lenz's ability to have a fair trial.[116]

*   *   *

In sum, there is no reason to try Count 2 with the other Counts in the Indictment. Here, the charges against the individuals are not of the same or similar character as Count 2. Count 2 has different elements and allegations than the others; Count 2 demands different questions of proof than the other charges; and Count 2 is brought against a different defendant—just the corporation, not the individuals. Beyond those categorical differences, the factual proof at issue for Count 2 should (and would) never come into evidence on the other Counts. And thus, Count 2 can't be jointly tried with Counts 1 and 4–9; it must be severed for a separate trial.

---

[116] *United States v. Bailey*, 840 F.3d 99, 121 (1st Cir. 2016); *United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011) (*citing United States v. Gonzalez–Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." (internal quotation marks omitted))).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**B.    Under Rule 14, the prejudice of trying Count 2 together with the rest of the charges means it must be severed.**

Even if the Court concludes that the Counts can be joined under Rule 8, the Court can (and should) order severance under Rule 14. The standards are different, and the inquiry for Rule 14 focuses less on the face of the indictment and more on balancing the efficiencies of trying the Counts together against the risk of unfair prejudice that would ensue.[117]

Here, there is little to be gained in terms of the efficient use of judicial resources by having all the Indictment's Counts tried together. Given the distinct evidentiary and legal questions between the Counts, the only savings would be in not having to select a second jury and not having a few workers testify twice that there was dust in the plant—a point that no one contests. The courtroom will be occupied for the same amount of time regardless of whether Count 2 is severed. Indeed, the Government believes that this is a six-week trial if all Counts are tried together; the defendants believe it may take up to seven weeks. Meanwhile, the defense estimates that a trial on just Counts 1 and 4–7 would be about four weeks and a separate trial on just Count 2 would take roughly two weeks. So, the trial time is roughly the same either way—the Court is simply having to choose one jury, instead of two.[118]

While the efficiency gains to the Court of having all the Counts tried together are slim, there is substantial cost to the defendants and the public if all Counts are tried

---

[117] WRIGHT & MILLER § 223–24 (prejudicial joinder of offenses and defendants).
[118] *United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978).

32

together in a single trial. In one trial, five lawyers paid at public expense will sit at counsel table through weeks of evidence on Count 2 unrelated to their clients' cases. That time could be spent working on other indigent clients' cases and better preparing each client's case for trial. Plus, those lawyers could sit silent at counsel's table. Or, they could use the testimony concerning Count 2 to bolster their own cases, dragging the trial out even longer. An even more likely scenario, however, would have those lawyers trying to protect their clients against the waves of unfair prejudice that flow from evidence of the workers' tragic deaths by making repeated motions for a mistrial. One of those motions might be granted and the whole trial might have to start over. Thus, when it comes to judicial economy, there's little to be gained in trying all the Counts together, and there is substantial risk of wasted public resources and inefficiency.

Taking the Rule 14 analysis one step further, immense prejudice would come to the defendants if Count 2 is tried together with the other Counts.[119] As one court framed the issue: "In determining whether a defendant suffered compelling prejudice, we consider factors including the jury's ability to separate the spillover evidence from the properly admitted evidence, and whether the spillover evidence would have tended to incite or arouse the jury into convicting the defendant on the remaining counts."[120] Count

---

[119] *See* Fed. R. Crim. P. 14; *see United States v. Shellef,* 507 F.3d 82, 101 (2d Cir. 2007).

[120] *United States v. Jackson,* 918 F.3d 467, 481–82 (6th Cir. 2019) (quotation and citation omitted); *see also Bean v. Calderon,* 163 F.3d 1073, 1083–86 (9th Cir. 1998) (discussing constitutionally impermissible joinder); *Bean,* 163 F.3d at 1084 (noting "that there is a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible" (internal quotation marks omitted)).

2's evidence includes testimony and physical evidence of death, destruction, and maimed bodies—evidence that is relevant to the culpability of only a faceless corporation. There is no jury that could hear that type of evidence and not hold responsible the individual defendants sitting in the courtroom.

To that end, it's hard to overstate how inflammatory evidence of the dead workers will be to Lenz. Reading the interview reports is jarring enough; having to see the photos and listen to the testimony would permeate and define the whole trial. And that's not just as a matter of testimony. Consider closing arguments: after the Government reminds the jury of the need for justice for the dead workers and sits down, Lenz's counsel would have to rise and refocus the jury on whether the baghouse log entries were accurate or, if not, whether the false statements were material. No jury could give Lenz's technical and nuanced legal arguments a fair hearing after listening to evidence of his co-workers' violent deaths.

That prejudice is precisely what the Court is called upon to protect Lenz and the other defendants from suffering, using the permissive mechanism of Rule 14 to sever Count 2. To state the point is to make the point: Lenz and the other individual defendants cannot have a fair trial if Count 2 is tried together with the other charges. As such, this Court should grant this motion and sever Count 2 from the other charges.

34

## II.  Second Pretrial Motion: Count 6 should be dismissed insofar as it pertains to Lenz aiding and abetting a false statement.

Lenz's second pretrial motion seeks dismissal of Count 6 under Rule 12(b) for failure to state an offense and constitutional infirmity.[121] This Court must dismiss any count that fails to state an offense, taking the allegations on their face and assuming them to be true.[122] As the D.C. Circuit has explained, "[a]dherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury."[123]

Further, fundamental fairness obligates the Government to seek an indictment that details the crime charged. As the Seventh Circuit has explained, "[f]or an indictment to be legally sufficient, it must accomplish three functions: it must state each of the elements of the crime charged; it must provide adequate notice of the nature of the charges so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense."[124] To do so, it needs to "contain a plain, concise, and definite written statement of the essential facts constituting the offense charged."[125] Sometimes parroting the statute's text is enough to accomplish this. But where any one of several criminal acts could trigger liability, the indictment must "descend to [the] particulars" of the facts underpinning the elements.[126] It's the

---

[121] Fed. R. Crim. P. 12(b)(3)(B).

[122] *See, e.g., Risk*, 843 F.2d at 1061.

[123] *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (citing *Russell v. United States,* 369 U.S. 749, 768–71 (1962)).

[124] *United States v. Fassnacht*, 332 F.3d 440, 444–45 (7th Cir. 2003) (citing U.S. CONST. amend. V, VI).

[125] Fed. R. Crim. P. 7(c)(1).

[126] *Russell v. United States*, 369 U.S. 749, 771, 774 (1962) (internal quotation marks omitted) (vacating judgment where indictment for violation of 2 U.S.C. § 192 had to, but did not, identify "the

35

Government's obligation "to ensure that the Grand Jury state[s] [the Government's] goal with certainty," using allegations that "establish the boundaries of the charged conduct" with enough specificity "to protect defendants from th[e] danger" of double jeopardy and allow them to "mount a meaningful defense."[127] Put differently, the indictment's language can't leave the "non-clairvoyant reader" to guess at the crime charged and "what was in the minds of the grand jur[ors] at the time they returned the indictment."[128]

When it comes to the § 1001(a)(3) charge in Count 6, the law is very familiar. Looking to the Seventh Circuit Pattern Jury Instructions, the Indictment must allege each of the following elements:

1.  The defendant [made; used] a false [writing; document];

2.  The defendant knew the [writing; document]contained a [false; fictitious; fraudulent] [statement; entry]; and

3.  The [false; fictitious; fraudulent] [statement; entry] was material; and

4.  The defendant [made; used] the [document; writing] knowingly and willfully; and

5.  The defendant [made; used] the [writing; document] in a matter within the jurisdiction of the [executive; legislative; judicial] branch of the government of the United States.[129]

---

question under congressional committee inquiry as found by the grand jury"); *accord United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981).

[127] *See Hitt*, 249 F.3d at 1026 (first quote); *United States v. Hillie*, 227 F. Supp. 3d 57, 76, 78–79 (D.D.C. 2017) (remaining quotes) (internal quotation marks omitted).

[128] *Hillie*, 227 F. Supp. at 72, 78 (dismissing child pornography charges for which indictment "omit[t]ed the particular facts that purportedly led the grand jury to conclude that (if proven) the elements of the charged offense would be satisfied") (collecting numerous additional cases).

[129] *See Seventh Circuit Pattern Instructions for* 18 U.S.C. § 1001(a)(3).

36

The statute of limitations for this offense is five years.[130]

Here, the Government's theory appears to depend on aiding-and-abetting liability, which imposes additional demands. Under the Supreme Court's ruling in *Rosemond,* aiding and abetting liability requires that the Government prove not just an act facilitating one or another element of the crime, "but also a state of mind extending to the entire crime."[131] Thus, the Indictment must allege that Lenz took an affirmative act to facilitate someone else's commission of the five elements listed above and that Lenz did so with the requisite intent.[132]

As set out below, there are four flaws in Count 6 that each independently requires its dismissal in full or in part. First, the Indictment fails to allege that Lenz acted with the intent required to aid and abet Winch in submitting a false statement to the WDNR, because there is no allegation that Lenz knew that Winch would submit falsified baghouse logs to WDNR in mid-August 2017 as part of its independent permit compliance inspection. Second, the Indictment's allegations are time barred as to Lenz, because his latest alleged act was in mid-March 2016, more than six years before the Indictment was returned. Third, Count 6 is unconstitutionally vague, because it fails to identify the particular baghouse log entry that the grand jury concluded was probably materially false.

---

[130] 18 U.S.C. § 3282(a); *United States v. Dunne*, 324 F.3d 1158, 1164–66 (10th Cir. 2003).

[131] *Rosemond v. United States*, 572 U.S. 65, 75–76 (2014).

[132] *See United States v. Ford*, 821 F.3d 63, 69 (1st Cir. 2016) ("To rule otherwise would be to say that we can put a person in prison for a crime, without congressional direction, merely because the person was negligent in failing to be aware of the fact that transformed innocent behavior into criminal behavior."); *United States v. McDowell*, 498 F.3d 308, 316 (5th Cir. 2007) ("The Government was required, but failed, to show McDowell not only knew [the principal] was selling obscene material, but also that the material was being delivered through the United States mails.").

37

Each of these first three flaws requires that Count 6 be dismissed in full as to Lenz. In the alternative, fourth, the defense submits that Count 6 must be dismissed in part. Even if the Court were to hold that Lenz could have aided and abetted Winch's false statement to WDNR with respect to the 2015 or 2016 baghouse logs, he could not have aided and abetted a false statement contained in the 2017 baghouse logs. For each reason, discussed at length below, Count 6 cannot remain intact as written.

### A.    Count 6 must be dismissed as to Lenz because it fails to adequately allege that Lenz had the requisite intent to aid and abet Winch in submitting a false statement to WDNR in mid-August 2017.

The first problem with Count 6 is that it doesn't allege that Lenz had the requisite intent to commit a § 1001(a)(3) violation. Again, the allegations in this Count are that Lenz knew that some of the 2015 and 2016 baghouse logs were missing data and that he encouraged his subordinates to backfill those logs with data that was allegedly inaccurate.[133] He did so, the Government alleges, by writing emails in 2016 that directed them to do so.[134] But there is no allegation that, at the time Lenz emailed subordinates to backfill blank baghouse log entries in 2016, he did so with the intent that Winch would submit those same logs to the WDNR in mid-August 2017.

The Indictment needed to contain that critical allegation, otherwise it fails to set out that Lenz acted with the requisite intent. Again, "a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission. *An intent to advance some different or lesser offense is not, or at least not usually,*

---

[133] R.8 ¶¶ 85, 89.
[134] *Id.*

38

*sufficient: Instead, the intent must go to the specific and entire crime charged.*"[135] That is, aiding-and-abetting liability attaches only to a "person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission."[136] Describing a prior case involving aiding and abetting mail fraud, the Supreme Court noted: "we found the requisite intent for aiding and abetting because the defendant took part in a fraud *'knowing' that his confederate would take care of the mailing.*"[137] As the Eight Circuit held in a case analogous to this one: "Though the government proved that the form sent to the government agency in connection with the defendant's home health care agency contained a false statement, *there was insufficient evidence that the defendant knew the false statement was submitted to the agency.*"[138]

Here, there is no allegation that Lenz knew the backfilled baghouse logs would be submitted to WDNR as part of a permit compliance review in August 2017. The specific allegation that Lenz knew, at the time he sent his emails, that the backfilled baghouse logs would be sent to the WDNR must be pleaded outright— it's not an allegation that the Government can ask this Court to read into the Indictment.[139]

---

[135] *Rosemond*, 572 U.S. at 75–76 (emphasis added) (citing 2 LaFave, *Substantive Criminal Law* § 13.2(c) (2003); W. Clark & W. Marshall, Law of Crimes, § 187, pp. 251–253 (2d ed. 1905); ALI, Model Penal Code § 2.06 Comment, p. 306 (1985).

[136] *Rosemond,* 572 U.S. at 77.

[137] *Id.* (citing *Pereria v. United States,* 374 U.S. 1, 12 (1954)); *see also Bozza v. United States,* 330 U.S. 160, 165 (1947).

[138] *United States v. Hayes*, 574 F.3d 460 (8th Cir. 2009) (emphasis added); *McDowell*, 498 F.3d at 316; *see also United States v. Lutz,* 154 F.3d 581, 586–87 (6th Cir. 1998).

[139] *See Hitt*, 249 F.3d at 1015–16.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The absence of such an allegation means that the Government has failed to allege an essential element of the offense. Lenz can't be convicted of violating § 1001(a)(3) based on Winch's submission of backfilled baghouse logs if he never intended that they be sent to WDNR as part of its permit compliance review in August 2017; directing a subordinate to backfill the log is one thing, but sending those logs to the WDNR, whose oversight may fall within the jurisdiction of the EPA, is another. The Indictment had to—but did not—allege that Lenz knew that those same logs would be sent (years later) to the WDNR. Put differently and more succinctly, without that missing allegation the claim can't survive. And thus, because Count 6 fails to allege an essential element of aiding and abetting a false statement, it must be dismissed.

### B. Count 6 must be dismissed as to Lenz because the statute of limitations already has run on any conduct that supports aiding and abetting liability.

The second (and more pronounced) problem with Count 6 is that Lenz's alleged acts are all outside the five-year statute of limitations.[140] The statute of limitations on a false statement charge begins to run when the false statement is made.[141] Section 1001(a)(3) is not a continuing offense for statute of limitations purposes.[142] Rather, § 1001 "contemplates a single act even though there may be continuing effects."[143] Thus, while every false statement could have continuing effects, those continuing effects don't toll the

---

[140] 18 U.S.C. § 3282.
[141] *Dunne*, 324 F.3d at 1164–66.
[142] *United States v. Grenier*, 513 F.3d 632, 639 (6th Cir. 2008); *Dunne*, 324 F.3d at 1164–66.
[143] *Dunne*, 324 F.3d at 11164–65.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

statute of limitations—the timeliness of an offense turns on when the statement is made in comparison to when the offense is indicted.[144]

The Supreme Court explained this concept at length in *Toussie v. United States*, and its discussion provides a helpful analysis-by-analogy here.[145] In *Toussie*, the Court held that failing to register for the draft is not a continuing offense, and it dismissed an indictment for that offense as untimely charged.[146] Looking to the statute's text, it explained that "the act of registration" was the act that Congress sought to enforce. Although failing to register had the lingering effect of ongoing non-compliance, it wasn't a continuing offense because *the act* of failing to register was "not a continuing process."[147] Instead, the "instantaneous event[]" of *not* registering when required was the crime.[148] Applying that analysis to § 1001(a)(3) generates the same result. In that statute, the act of "mak[ing] or us[ing] any false writing or document, knowing the same to contain any materially false, fictitious, or fraudulent statement or entry," is the act that Congress sought to enforce. That is not a continuing process; it is an instantaneous event. The crime is complete—and the statute of limitations begins to run—at the time the false writing or document is made or used, with the requisite criminal knowledge.

---

[144] *Id.; see also Grenier,* 513 F.3d at 639; *United States v. Gremillion-Stovall*, 397 F. Supp. 2d 798, 802 (M.D. La. 2005).
[145] 397 U.S. 112 (1970).
[146] *Id.* at 124.
[147] *Id.* at 122.
[148] *Id.*

41

That rule goes beyond the statute's plain text and resonates in everyday logic.[149] If a person makes a false statement six years or six decades earlier, the statute of limitations begins to run on the date the false statement is made. The crime can't be revived later on, simply because someone, years later, repeats the false statement in connection with a matter over which a federal agency has jurisdiction.[150] Indeed, by way of example, if Steve Jobs made false statements in Apple's initial financial statements to the SEC and Tim Cook subsequently delivered those statements (amidst other materials) to the IRS in an audit thirty years later, nobody would think that Jobs is exposed to renewed liability for aiding and abetting Cook in making a false statement to the IRS. Allowing the Government to circumvent the statute of limitation in such a scenario cuts against the very reason why Congress provides certain and definite statute of limitations. If the Government were permitted to charge Jobs for Cook's IRS submission, then "the limitations period would be virtually unbounded."[151]

Here, the Government seeks to revive similarly expired conduct. The allegations make plain that Lenz's latest-in-time conduct was on March 14, 2016, when he sent an email to subordinates to backfill baghouse logs from earlier that year, before he left his position as environmental manager. To the extent those directives themselves exposed Lenz to aiding-and abetting-liability—on the premise that the baghouse logs were

---

[149] *See Toussie*, 397 U.S. at 120.

[150] *See United States. v. Davis*, 533 F.2d 921, 928 (5th Cir. 1976) (holding a § 371 for a false statement "[n]either was the limitation period extended because the Department of Labor relied upon the falsifications within five years prior to the return of the indictment.").

[151] *See United States v. Yashar*, 166 F.3d 873, 879 (7th Cir. 1999); *see also id.* (discussing the purpose of the statute of limitations and quoting *Toussie*, 397 U.S. 112).

42

maintained as part of Didion's general compliance with WDNR's permits and any non-contemporaneous entry in them is a materially false statement in a matter within the EPA's jurisdiction—those statements aren't timely charged. That conduct occurred more than six years before the grand jury returned this Indictment. Winch's act of sending those baghouse logs to WDNR in 2017 didn't extend the statute of limitations as to Lenz. And thus, Count 6 is untimely and must be dismissed.

### C.    Count 6 should be dismissed in full as unconstitutionally vague.

Independent of the flaws just described, Count 6 also must be dismissed in full because it violates Lenz's Fifth and Sixth Amendment rights. The Indictment is ambiguous as to which baghouse log entry is the one that the grand jury concluded probably triggers liability under § 1001(a)(3). And this ambiguity creates a three-part problem of constitutional dimension. It fails to put the defense on notice of the crime with which Lenz has been charged, it leaves all to guess at the offense that the grand jury indicted, and it doesn't provide Lenz with protection against double jeopardy in any future prosecution.

Two elements of the offense—falsity and materiality—hinge on which statement in the 2015, 2016, or 2017 baghouse logs is at issue. This means that "only a grand jury could determine whether a person should be held to answer in a criminal trial for" falsifying an entry in that log and, to do so, the grand jury "must necessarily determine" *which* entry was actually false and whether that falsity mattered.[152] And an indictment that

---

[152] *See Russell*, 369 U.S. at 770.

"completely fails to identify what the alleged false statement was" and fails both "to apprise [the defendant] sufficiently of that which she must be prepared to meet at trial" and "to ensure that she [is] prosecuted on the same facts actually presented to the grand jury which indicted her."[153] In other words, the particular baghouse log entry at issue is a factual allegation that must be included in the Indictment.

Yet, Count 6 leaves Lenz to simply guess at the conduct alleged to be criminal. Nowhere does the Indictment identify the entry that the grand jury believed was probably materially false. Instead, Count 6 simply alleges that there were "thousands of false pressure drop entries" in the logs and that one was "a materially false, fictitious, and fraudulent statement and entry."[154] And no other paragraph in the Indictment fills the gap.

These deficient allegations contravene Lenz's rights under Fifth and Sixth Amendments. They leave unclear which entry supported the grand jury's probable cause finding and gives the Government "a free hand to insert the vital part of the indictment without reference to the grand jury."[155] Indeed, the grand jury may have "indict[ed] with one crime in mind," based on one entry, while the Government might try the case "by

---

[153] *See United States v. Cuevas*, 285 F. App'x 469, 470 (9th Cir. 2008) (per curiam) (vacating conviction under § 1001 for deficient indictment and holding that, "[b]ecause the indictment on this charge completely fails to identify what the alleged false statement was, it failed to apprise Cuevas sufficiently of that which she must be prepared to meet at trial"); *see also United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) (per curiam) (vacating convictions for obtaining something of value by false pretenses with intent to defraud where indictment "failed to specify the false representations . . . which are the very core of the offense").

[154] *See* R.8 ¶ 121–22.

[155] *See Nance*, 533 F.2d at 701.

44

producing evidence of a different crime," based on a different entry.[156] It also makes it impossible for Lenz to prepare a defense or guard against double jeopardy in the future, given that any one of several purported criminal acts might be the one at issue.[157] Count 6 is fundamentally flawed.

The Seventh Circuit has overturned convictions on charges that suffered from analogous flaws. In *Hinkle*, for example, a defendant was charged with six counts of using a telephone to facilitate a federal drug offense (21 U.S.C. § 843(b)), but none of the counts "specif[ied] which of the over one hundred and forty-two controlled substances specified in 21 U.S.C. § 812 [she] may have discussed over the telephone on any given day, nor did they specify which [of six] type[s] of acts, constituting a felony, were facilitated."[158] The problem, the court explained, was that the indictment told the defendant "nothing about the gravamen of the alleged offense: what she attempted to facilitate with which controlled substance."[159] Merely including the date on which the purported facilitation occurred "add[ed] little if anything to her knowledge of the charges against her, given the frequency with which most people use the telephone during any one day."[160] The court vacated her convictions on those counts.[161]

---

[156] *See United States v. Thomas*, 444 F.2d 919, 922 (D.C. Cir. 1971).
[157] *E.g.*, *United States v. Sunia*, 643 F. Supp. 2d 51, 77–81 (D.D.C. 2009) (dismissing obstruction charge under 18 U.S.C. § 1505 in light of inadequate pleading, creating presentment issue).
[158] 637 F.2d at 1156.
[159] *Id.* at 1158.
[160] *Id.*
[161] *Id.* at 1159.

45

Here, the same type of essential information is missing. Just as the defendant in *Hinkle* had to guess at which of 142 controlled substances and which of six acts the grand jury believed she purportedly facilitated by phone on six different dates, Lenz must guess at which of 45,990 entries is purportedly false and then guess again at which entry in that subset is the one that the grand jury believed was material. Including the date on which Winch gave the 2015, 2016, and 2017 baghouse logs to WDNR does nothing to define the charge. At most, the August 16, 2017, date  clarifies that liability on Count 6 can't turn on the certification statements or deviation summary reports, because, as the Indictment elsewhere alleges, those statements were given to WDNR on different dates.[162] In other words, the date merely *confirms* that liability on Count 6 turns on the grand jury having identified one of the 45,990 entries in the baghouse logs themselves, turned over on August 16, 2017, as materially false. Count 6 is constitutionally flawed.

As a final note, a bill of particulars can't fix this flaw. Although "a *valid* indictment can be clarified through a bill of particulars, an *invalid* indictment cannot be saved by one."[163] Allowing the Government to mend a deficient indictment with a bill of particulars would usurp the role of the grand jury, preclude fair notice, and allow gamesmanship by the prosecution.[164] Accordingly, Count 6 must be dismissed in full.

---

[162] *See* R.8 ¶¶ 109, 115 (Winch submitted compliance certification and deviation summary reports to WDNR on August 14, 2017, and February 8, 2018).

[163] *Hillie*, 227 F. Supp. 3d at 81; *accord Hinkle*, 637 F.2d at 1156 ("The government did not provide a bill of particulars, which in any event would not have cured this deficient indictment.").

[164] *Thomas*, 444 F.2d at 922–23 (bill of particulars cannot cure an indictment that omits factual allegations of a material element of the offense).

46

### D.    In the alternative, Count 6 must be dismissed in part because it fails to allege that Lenz helped falsify the 2017 baghouse log.

For all the reasons just discussed, Count 6 should be dismissed in full. At a minimum, however, it must be dismissed in part, as to Lenz. Count 6 suggests that the materially false statement at issue (one of 45,990 potentially false entries) could be in the 2015, 2016, *or* 2017 baghouse logs. But the Indictment fails to allege that Lenz had anything to do with the *2017* baghouse log and, therefore, doesn't allege that he aided and abetted its falsification. Thus, that portion of Count 6 must be dismissed.

According to the Indictment, Lenz's involvement with the baghouse logs ended by the spring of 2016. Lenz left his role as Didion's environmental manager in April 2016. He was employed as a part-time consultant at Didion at some point thereafter. And, although the Indictment alleges that he worked on the baghouse logs while an environmental manager, there is no allegation that he had the same responsibilities (or *any* responsibilities concerning the baghouse logs) as a part-time consultant. In fact, the latest-in-time allegation concerning Lenz is March 14, 2016—*before* he left his post as environmental manager. In that allegation, as the environmental manager, he purportedly instructed others to backfill blank entries in the baghouse logs for February and March 2016.[165] There also is an allegation that, one month earlier, he directed others to backfill blank entries in the December 2015 baghouse log.[166] But there is *no* allegation that Lenz had any involvement with the 2017 baghouse logs. Nor is there any allegation that Lenz knew that

---

[165] R.8 ¶ 91.
[166] *Id.* ¶ 90.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

backfilling would continue after his discrete emails, let alone that he intended such to happen.

It follows that the Indictment fails to allege that Lenz aided and abetted Winch in making a false statement to WDNR based on a false entry in a 2017 baghouse log. For Lenz to be held liable based on the knowing and willful submission of a materially false 2017 baghouse log entry, the Indictment needed to allege that he took "an affirmative act in furtherance of that offense" and that he acted "with the intent of facilitating the offense's commission."[167] Instead, the Indictment alleges that Lenz directed others to backfill the *2015 and 2016* baghouse logs and that he then left the very position in which he had authority to direct that action. Missing is any allegation that Lenz took an "affirmative act" towards falsifying an entry in the *2017* baghouse log, let alone any allegation that he did so with the requisite intent that that false entry be sent to WDNR.

Importantly, the allegations that Lenz helped falsify the 2015 and 2016 baghouse logs are not allegations that he aided and abetted Winch in making a false statement to WDNR through the 2017 baghouse logs. The break in Lenz's role vis-à-vis the company and baghouse logs matters. As discussed at the outset of this motion, aiding-and-abetting liability is premised on a defendant having advance knowledge of another's anticipated conduct—"knowledge that enables him to make the relevant legal (and indeed, moral) choice" whether to align himself with the conduct or "quit the crime" by "opt[ing] to walk away."[168] If a defendant doesn't have foreknowledge of his confederate's conduct,

---

[167] *Rosemond*, 572 U.S. at 71.
[168] *Id*. at 78.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

then he doesn't have the requisite intent to aid and abet that conduct.[169] Here, the Indictment doesn't allege that Lenz, acting in 2015 and 2016, had advance knowledge that baghouse logs would be backfilled in 2017. What's more, even if that knowledge could be inferred, the Indictment doesn't allege that Lenz "associated" himself with it and "participate[d] in it as something that []he wishe[d] to bring about."[170] Rather, it alleges that *he walked away* by leaving a position that involved the baghouse logs and that he did so well before Winch gave the 2017 logs to WDNR.

When an indictment fails to allege an offense based on certain allegations, the proper course is to dismiss those faulty allegations.[171] Here, Count 6 fails to state an offense under § 1001(a)(3) as to Lenz based on any materially false entry in the 2017 baghouse. Thus, it must be dismissed to the extent that it alleges that Lenz can be held liable for aiding and abetting Winch in making a false statement to WDNR based on the 2017 baghouse logs.

---

[169] *Id.*

[170] *See United States v. Anderson*, 988 F.3d 420, 425 (7th Cir. 2021) (reaffirming primer principles on aiding-and-abetting liability: "where A sells contraband to B, and B sells the same item to C, A is not an accessory to crimes committed by C solely by virtue of her sale to B"; "A must 'associate' herself with C's offense and participate in it as something that she wishes to bring about" (cleaned up)).

[171] *E.g.*, *Sunia*, 643 F. Supp. 2d at 68–69 (dismissing, in part, count of indictment charging violation of Section 666(a) that failed to allege defendant was an "agent" during particular time period).

49

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### III.    Third Pretrial Motion: The Court must dismiss Count 4 because it fails to allege a single conspiracy.

Count 4 purports to allege a § 371 conspiracy, but there are two problems with its allegations. First, the Government has failed to plead all the elements of a § 371 conspiracy as to Lenz, because it doesn't allege that he agreed to all the purported objectives of the conspiracy. Here, the allegations of the conspiracy's object center on the investigations that began on May 17, 2017, and June 1, 2017, respectively—each well after Lenz left the company and, by extension, any conspiracy. There is no allegation that he agreed to obstruct those later investigations. The second problem, which naturally flows from the first, is that Count 4 is duplicitous—it charges two distinct conspiracies in a single count. The first conspiracy involves an illegal agreement to falsify the baghouse logs, while the second conspiracy involves an illegal agreement to falsify the MSS log. For either or both reasons, Count 4 must be dismissed pursuant to Rule 12(b)(3)(B).[172]

#### A.    For a single conspiracy to exist, as charged, the defendants couldn't have conspired until June 1, 2017—more than a year after Lenz left the corporation.

Conspiracy is, of course, a crime separate and distinct from the substantive offense.[173] A § 371 conspiracy requires proof of: (1) an agreement among the conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy; and (3) an overt act to effect the object of the conspiracy.[174] Although the Government need not prove commission of the substantive offense or even that the conspirators knew all

---

[172] Fed. R. Crim. P. 12(b)(3)(B)(i), (v).
[173] *United States v. Feola*, 420 U.S. 671, 694 (1975).
[174] *See United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir. 1991).

the details, it must prove that "the intended future conduct they . . . agreed upon include[s] all the elements of the substantive crime."[175] That demand distinguishes agreements to do bad things (writ large) from actual agreements that have a unity of purpose to violate the laws of the United States.[176] After all, the criminal law is not meant to perfect people's character but to punish criminal wrongdoing.[177] Further, an indictment that alleges a conspiracy with multiple objects of a conspiracy must allege that the parties' agreement extended to all the elements of those separate objects.[178]

Here, Count 4 purports to allege that Lenz and others agreed to commit three substantive acts:

   a. Under § 1001, making and using a false document in matters within the jurisdiction of the EPA and OSHA.[179]

   b. Under § 1519, falsifying a document in relation to a federal investigation—specifically, falsifying any record with intent to obstruct an investigation by the EPA and OSHA.[180]

   c. Under § 1505, obstructing a pending agency proceeding that is being had before OSHA.[181]

---

[175] *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996) (*quoting United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978)); *see also Ocasio v. United States*, 578 U.S. 282, 287 (2016) ("under established case law, the fundamental characteristic of a conspiracy is a joint commitment to an endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense" (internal quotation marks omitted; alteration adopted)).

[176] *Salinas v. United States*, 522 U.S. 52, 63 (1997); *United States v. Giry*, 818 F.2d 120, 126–27 (1st Cir. 1987).

[177] *See United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc).

[178] *See Rose*, 590 F.2d at 235.

[179] R.8 ¶ 73(a) (citing 18 U.S.C. § 1001(a)(3)).

[180] *Id.* ¶ 73(b) (citing 18 U.S.C. § 1519)

[181] *Id.* ¶ 73(c) (citing 18 U.S.C. § 1505).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

To pass muster, then, the Government needed to allege that Lenz was in an agreement with the others to violate all three of these laws and allege that the conspiracy reached all the elements of the substantive offense that they agree to violate.[182]

Two of these statutes (§§ 1505 and 1519) require that the proceeding at issue be foreseeable or already occurring. Importantly, consistent with the Supreme Court's rulings in *Aguilar* and *Arthur Andersen,* there needs to be some "nexus" or "relationship in time, causation, or logic" between the obstructive conduct and the underlying proceeding before a defendant can be held liable under either § 1505 or § 1519.[183] Put differently, under any of these statutes, you cannot obstruct an investigation that you're not aware of existing or can't foresee and, by the same token, you can't conspire to obstruct something that you don't know is happening or soon could happen.[184] As the Supreme Court observed in *Aguilar,* "[i]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding," then "he lacks the requisite intent to obstruct."[185] So, a conspiracy to commit all the substantive elements of § 1505 or § 1519 can't arise until the agency proceeding that the co-conspirators intend to obstruct is foreseeable or actually exists.

Defining the scope of alleged conspiratorial agreement—namely, to obstruct the OSHA and WDNR investigations—in relation to the triggering events guides the

---

[182] *Ocasio*, 578 U.S. at 287; *Rose*; 590 F.2d at 235; *Hitt,* 249 F.3d at 1015–16.

[183] *United States v. Aguilar*, 515 U.S. 593, 599 (1995); *see also Arthur Andersen, LLP v. United States,* 544 U.S. 696, 702 (2005).

[184] *United States v. Price,* 951 F.2d 1028, 1030–31 (9th Cir. 1991); *see also Arthur Anderson,* 544 U.S. at 707–08.

[185] *Aguilar,* 515 U.S. at 599; *see also Arthur Andersen LLP,* 544 U.S. at 708.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

analysis. After all, the conspiratorial agreement defines the crime and (importantly) when the statute of limitations runs.[186] As the Supreme Court held in *Grunewald*: "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."[187] Here, the putative investigation by a federal entity (OSHA or the EPA (via WDNR)) is an essential element to the substantive crime that Lenz allegedly conspired to commit; he can't agree to commit the elements of the offense until the precondition arises—namely, there is something you need to agree to obstruct.

The Indictment is long, but, when scrutinized, it's evident that it fails to allege an essential element of this § 371 offense as to Lenz: that he agreed to all three objects. Here, all three of the conspiracy's purported objectives relate to the investigations that began in May and June 2017, when WDNR started to investigate Didion's permit compliance and OSHA began investigating the cause of the explosion, respectively. (The Indictment treats WDNR's investigation as an investigation by the EPA, because the EPA had the ability to enforce the permit's terms.) Thus, there could not be a single conspiratorial agreement to violate 18 U.S.C. § 1001, 1505, *and* 1519—vis-à-vis these investigations—until *after* the explosion, when both investigations were underway.[188] Yet, the Indictment alleges, Lenz left Didion's full-time employ more than a year earlier and makes no

---

[186] *United States v. LaSpina*, 299 F.3d 165, 173 (2d Cir. 2002).

[187] *Grunewald v. United States,* 353 U.S. 391, 396 (1953); *see also Davis*, 533 F.3d at 926.

[188] *Rose*, 590 F.2d at 235.

allegation that he continued to have authority over the baghouse logs. And it contains no allegations that Lenz agreed to obstruct OSHA's investigation or WDNR's investigation. Indeed, neither of those investigations commenced until well after Lenz stepped down as environmental manager and neither was foreseeable at the time when he was the environmental manager. In fact, it's not even alleged that he still was a part-time consultant or otherwise affiliated with Didion in May 2017. Instead, any conspiracy in which Lenz allegedly was involved did not reach past (at the latest) April 2016 and prosecution now is barred by the statute of limitations.

### B.   Count 4 is duplicitous; it charges one conspiracy concerning the baghouse log and a second concerning the MSS log.

The fact that Count 4 fails to allege a single conspiratorial agreement begets the second problem with Count 4: it actually alleges two separate conspiratorial agreements in one count. As discussed throughout this brief, Lenz's alleged role in his case predates April 2016 and is limited to the baghouse logs. Count 4 is duplicitous because it alleges one illegal agreement concerning falsification of the baghouse logs (including Lenz) and a separate illegal agreement concerning falsification of the MSS log (not involving Lenz).

When the Government has alleged two separate conspiracies in a single count, as it has here, the charge is duplicitous and must be dismissed with leave to re-file as two conspiracies. Under Rule 12, the Court must dismiss any count in the indictment that "join[s] two or more offenses in the same count (duplicity)."[189] Charging more than one offense in a single count creates a "risk that a jury divided on two different offenses could

---

[189] Fed. R. Crim. P. 12 (b)(3)(B)(i).

54

nonetheless convict for the improperly fused double count."[190] Courts evaluate whether a count alleges one or more conspiracies based on "the overlap of key actors, methods, and goals" between the purportedly separate agreements.[191]

Here, there is not one conspiracy, but two separate ones. They have key actors, methods, and goals that are distinct from one another:

|  | MSS Conspiracy | Baghouse Conspiracy |
|---|---|---|
| *Actors* | Didion, Clark, Mesner, Hess, Niemeyer | Didion, Winch, Clark, Lenz, Hess, Niemeyer |
| *Methods* | Direct others to backfill MSS log and actually backfill MSS log; | Direct others to backfill baghouse logs and actually backfill those logs; |
|  | Sign-off on MSS log, knowing its entries are false; *and* | Give falsified baghouse logs to the auditor or WDNR; *and* |
|  | Give false testimony about MSS log's accuracy | Certify to WDNR that Didion complied with its baghouse monitoring requirements for its permits |
| *Goals* | Obstruct OSHA's post-explosion investigation of Didion's workplace conditions, from June 1–November 10, 2017, in violation of § 1505 | Help Didion pass its environmental compliance audit, from 2010–2015; *and* |
|  |  | Obstruct WDNR's pre-explosion permit-compliance investigation, from May 17–November 10, 2017, in violation of §§ 1001(a)(3) and 1519 |

---

[190] *See United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017).

[191] *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1998) (citation omitted); *cf. United States v. Jeffers*, 570 F.3d 557, 567 (4th Cir. 2009) ("[A] single conspiracy exists[] when the conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same product." (internal quotation marks omitted)).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

As the side-by-side comparison makes plain, Count 4 alleges two separate agreements by different groups of people to falsify two different documents, during different time periods, for different purposes. Each conspiracy has a key actor that the other does not—the MSS log conspiracy involves Mesner, while the baghouse log conspiracy does not; the baghouse log conspiracy involves Lenz and Winch, while the MSS log conspiracy does not. Each conspiracy involves different methods—one pertains to falsifying the MSS log and giving false testimony about that log, while the other pertains to falsifying the baghouse log. And they have discrete goals for doing so—the first group aimed to obstructing an OSHA investigation occurring from June–November 2017, as a result of the explosion; the second group began conspiring much earlier, for the purpose of defrauding a third-party environmental audit from 2010–2015, and then the remaining co-conspirators (after Lenz withdrew) aimed to obstruct WDNR's permit compliance investigation from May–November 2017. Further, as these different goals reflect, the first agreement focused on helping Didion comply with its workplace safety obligations, while the second conspiracy aimed to help it comply with its environmental safety obligations.

Indeed, the Court need look no further than the Government's extensive list of overt acts to be convinced that Count 4 alleges two conspiracies. The overt acts are split between the two operations—no single factual allegation touches on both. In other words, there is not one factual allegation in the Indictment in which one co-conspirator directed another to falsify *both* the MSS log and the baghouse logs. This chart illustrates the point:

56

| Baghouse Log Referenced | Paragraph | MSS Log Referenced |
|:---:|:---:|:---:|
| ✓ | 85 | |
| | 86 | ✓ |
| | 87 | ✓ |
| | 88 | ✓ |
| ✓ | 89 | |
| ✓ | 90 | |
| ✓ | 91 | |
| ✓ | 92 | |
| | 93 | ✓ |
| | 94 | ✓ |
| | 95 | ✓ |
| | 96 | ✓ |
| | 97 | ✓ |
| | 98 | ✓ |
| | 99 | ✓ |
| | 100 | ✓ |
| ✓ | 101 | |
| | 102 | ✓ |
| | 103 | ✓ |
| | 104 | ✓ |
| ✓ | 105 | |
| | 106 | ✓ |
| | 107 | ✓ |
| ✓ | 108 | |
| ✓ | 109 | |
| ✓ | 110 | |
| | 111 | ✓ |
| | 112 | ✓ |
| | 113 | ✓ |
| ✓ | 114 | |
| ✓ | 115 | |

As the chart reflects, there isn't a single overt act allegation in which *both* the baghouse log and the MSS log are mentioned. What's more, Lenz is mentioned only in Paragraphs

57

85, 89, 90, and 91—which all pertain to the baghouse logs. Indeed, there is no factual allegation that ties Lenz to the MSS logbook. These are different conspiracies, charged within the same count. And, as such, Count 4 is duplicitous.

To be clear, the defense's complaint about Count 4 doesn't rest on the fact that it purports to be a conspiracy with multiple objectives. Again, there is nothing wrong with charging multiple illegal objectives in a single conspiracy.[192] After all, "[a] single conspiracy may have as its objective the distribution of two different drugs without rendering it duplicitous."[193] But the Government cannot charge two separate conspiratorial agreements within the same count. And that's what it has done here. Count 4 must be dismissed.

> **IV.    Fourth Pretrial Motion: If the charges against Lenz are not dismissed in full, then the Court should order the Government to provide a bill of particulars.**

For all the reasons outlined above, the charges against Lenz should be dismissed in their entirety. Should the Court find that the flaws in the Indictment aren't fatal, however, then the defense respectfully moves the Court for an order directing the Government to file a bill of particulars.

Under Rule 7, "[t]he court may direct the government to file a bill of particulars."[194] A bill of particulars is warranted when the indictment doesn't provide the defendant with adequate information to allow him to understand the charges against him, prepare his

---

[192] *Braverman v. United States*, 317 U.S. 49, 54 (1942); *United States v. Dale*, 178 F.3d 429, 431 (6th Cir. 1999).
[193] *Dale*, 178 F.3d at 431; *United States v. Clark*, 67 F.3d 1154, 1160 (5th Cir. 1995).
[194] Fed. R. Crim. P. 7(f).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

defense, protect against double jeopardy, and avoid unfair surprise at trial.[195] In other words, its purpose it to provide "information necessary to permit the defendant to conduct his *own* investigation."[196]

The defense moves for a bill of particulars that identifies three discrete categories of information. First, it should identify all unindicted individuals who the Government may contend are Lenz's co-conspirators, for purposes of Count 4. Second, it should identify which baghouse log entry purportedly creates liability under § 1001(a)(3), for purposes of Count 6. And third, the bill of particulars should identify the dates on which the Government contends that Lenz joined and withdrew from the conspiracy. As set out below, each category of information is necessary for Lenz to investigate this case, prepare his defense, and avoid unfair surprise.

###    A.    The Government must identify all unindicted individuals who it may argue at trial are Lenz's co-conspirators.

The Indictment leaves Lenz to guess at the identities of those with whom the Government may claim that he conspired. As this Court has explained before, "[t]he identities of . . . unindicted co-conspirators . . . are proper matters for inclusion in a bill of particulars."[197] What's more, it's appropriate for the defense to request a bill of particulars in order to "discover[] the names of unindicted coconspirators who the government plans

---

[195] *E.g.*, *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam) (collecting authority); WRIGHT & MILLER § 130 (same).
[196] *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985).
[197] *United States v. Fine*, 413 F. Supp. 740, 746 (W.D. Wis. 1976).

to use as witnesses," and it's "common practice" for courts to grant such a motion.[198] As set out below, learning that information now is necessary for Lenz's counsel to investigate this case and prepare a defense, as well as to avoid unfair surprise at trial and guard against double jeopardy in any future prosecution.

To begin, Lenz needs this information in order to investigate the case. Potential alleged co-conspirators may number in the dozens (if not hundreds).[199] At the same time, the unidentified "others" with whom the Government believes Lenz conspired are likely to be individuals with the most information relevant to this case. The fact that the Indictment is "detailed" as to other allegations doesn't provide the details that the defense needs about these "other" participants.[200] As the Eastern District of Wisconsin has explained, "where numerous individuals are named in the discovery . . . it is important that a defendant understand which of those persons the government alleges were part of the conspiracy."[201] Here, given the length and scope of the purported conspiracy, Lenz has "a right to know the names of [his] alleged co-conspirators" "as a matter of fundamental fairness."[202] And he needs that information now so that he and his counsel have adequate

---

[198] *United States v. Barrentine*, 591 F.2d 1069, 1077 (5th Cir. 1979) (citing *Will v. United States*, 389 U.S. 90, 99 (1967)) (first quote); *United States v. Sykes*, No. 17-cr-96, 2018 WL 3245205, at *3 (E.D. Wis. Feb. 2, 2018) (second quote; collecting authority); *accord United States v. Rogers*, 617 F. Supp. 1024, 1028–29 (D. Colo. 1985) (collecting authority).
[199] *See supra* at 20.
[200] *See United States v. Allocco*, 801 F. Supp. 1000, 1003 (E.D.N.Y. 1992) (although mail-fraud indictment was "detailed," court directed government to "provide defendant with the names of 'the others' referred to in the indictment in order to allow [him] to properly prepare for trial").
[201] *United States v. Urbina*, No. 06-cr-336, 2007 WL 2220205, at *3 (E.D. Wis. 2007).
[202] *See United States v. Currie*, No. 10-532, 2011 WL 1527014, at *2 (D. Md. Apr. 20, 2011).

60

opportunity to try to contact those individuals and learn who may have relevant information about the allegations in the Indictment.[203]

Further, Lenz must have this information in order to prepare his defense. Alleged co-conspirators' actions will shape the nature of the charges against him and the conduct for which he might be held responsible. Undoubtedly, the Government will seek to introduce into evidence alleged co-conspirator statements, under Rule 801(d)(2)(E), and it will argue that Lenz is vicariously liable, under *Pinkerton*, for substantive offenses committed by those alleged co-conspirators. It will "meaningfully alter the nature of the charges and, accordingly, [Lenz's] prepare for trial" if "the Government consider[s] him to be conspiring with other individuals, rather than only [his co-defendants]."[204] And Lenz "has a right to know what he will be facing so that he may prepare to defend against it."[205] But, presently, he's left to guess at relevant conduct and the universe of documents arguably admissible under Rule 801(d)(2)(E). He "should not have to waste precious pretrial preparation time guessing what [conduct] . . . will be relevant to [his] defense."[206] To undercut that guesswork, courts have directed the Government to produce a bill of particulars identifying the "names of all persons the government would claim at trial were

---

[203] *E.g.*, *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (ordering disclosure of names of unindicted co-conspirators immediately, rather than two months before trial, so defense could prepare its case).

[204] *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 & n.5 (S.D.N.Y. 2018).

[205] *United States v. Young*, No. 98 CR 91 X 1, 2005 WL 2100975, at *1 (W.D. Wis. Aug. 30, 2005).

[206] *See United States v. Palfrey*, 499 F. Supp. 2d 34, 52 (D.D.C. 2007).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

co-conspirators (whether or not they will be called as trial witnesses)"—the very information that Lenz is requesting.[207]

Relatedly, Lenz's interests in avoiding unfair surprise at trial and guarding against double jeopardy also cut in favor of ordering the Government to provide this information. By shrouding the individuals with whom he purportedly conspired, the Indictment simultaneously leaves ambiguous the potential scope of conduct for which Lenz could be held vicariously liable. Trial by ambush isn't justice; "the [G]overnment must commit to its theory" so that Lenz isn't "surprised at a later point by the addition of a new name or allegation."[208] What's more, a fluid theory of prosecution implicates Lenz's ability to guard against double jeopardy. The conspiracy offense is defined through its participants and their actions; without knowing his purported confederates for the conspiracy charged in Count 4, Lenz can't know whether a future prosecution for a purported conspiracy offense is a re-trying of these same allegations. For this reason, too, courts have ordered the Government to produce a bill of particulars identifying "the names of the known, unindicted co-conspirators."[209] The same order is warranted here.

---

[207] *See United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999); *see also, e.g.*, *United States v. Yielding*, No. 4:08–CR–00213 BSM, 2008 WL 5114305, at *2 (E.D. Ark. Dec. 4, 2008) (ordering bill of particulars "identify[ing] all aiders and abetters" who "have made statements that the government may seek to introduce pursuant to" Rule 801(d)(2)(E)).

[208] *Young*, 2005 WL 2100975, at *1 (first quote); *United States v. Manafort*, Crim. Action No. 17-0201-01 (ABJ), 2018 WL 10394893, at *3 (D.D.C. June 12, 2018) (second quote).

[209] *United States v. Gallegos*, No. 16-434-AKK-JEO, 2017 WL 2374800, at *7 (N.D. Ala. Apr. 13, 2017).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### B. The Government must identify which baghouse log entry is the one it will contend at trial is materially false.

A bill of particulars also is needed to clarify which baghouse log entry the Government will claim at trial is materially false. The Government has this information on hand; after all, in a false statements case, like this one, "the starting point for everything is the statement."[210] General descriptions of alleged false statements don't suffice. Rather, as another district court has explained, descriptions of false statements in criminal cases should be pleaded with the same particularity as described in Rule 9(b); "[i]n fact, application of this rule in criminal cases is even more compelling than in civil matters because defendants' liberty interests are at stake."[211]

Lenz is not in a position to prepare a defense, and will be unfairly surprised at trial, if left to sort through tens of thousands of baghouse log entries and guess at which the Government might contend at trial is the basis for criminal liability. And he shouldn't have to do so. As another court in this Circuit has observed, a defendant "should not have to waste pre-trial preparation time guessing which statements he has to defend against when the government knows precisely the statements on which it intends to rely."[212] Plus, any suggestion that, through due diligence, Lenz can identify "what part of the . . . [provided] information constitute[s] the actual false statement" is "inconsistent with the presumption of innocence."[213] The Government "d[oes] not fulfill its obligation merely

---

[210] *United States v. Clifford*, 426 F. Supp. 696, 703 & n.4 (E.D.N.Y. 1976).

[211] *Rogers*, 617 F. Supp. at 1029.

[212] *United States v. Meek*, No. 19-cr-378-JMS-MJD, 2020 WL 2218953, at *5 (S.D. Ind. May 7, 2020) (cleaned up).

[213] *Trie*, 21 F. Supp. 2d at 21; *accord* WRIGHT & MILLER § 130.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

by providing mountains of documents to defense counsel" and leaving them "unguided as to which documents would be proven falsified."[214]

In circumstances like these, courts across the country have ordered the Government to identify the purportedly false statements on which it intends to rely at trial. For example, in *United States v. Elbaz*, the Maryland district court ordered the Government to produce a bill of particulars identifying "allegedly false statements made directly by [the defendant], if any, that it intends to introduce at trial, including the date of the statement and the person to whom it was made."[215] And in *United States v. Risk* another court in this Circuit ordered the Government to identify the "specific portions, segments, or sentences of the bank report that are alleged to be and that the government intends to prove are false."[216] Here, analogous circumstances exist, and the same type of solution—an order directing the Government to identify with particularity the allegedly false baghouse entry—is warranted, if dismissal is not in order.

### C.    The Government must identify when it alleges Lenz joined and withdrew from the conspiracy.

Finally, the Court should direct the Government to identify the dates on which it will contend that Lenz joined and withdrew from the purported conspiracy in Count 4. Given how co-conspirator liability operates, those dates dramatically affect the scope of the case against Lenz. And the Indictment leaves that scope ambiguous. To the extent it

---

[214] *Bortnovsky*, 820 F.2d at 575 (reversing verdict for failure to provide bill of particulars).
[215] 332 F. Supp. 3d 960, 982–83 (D. Md. 2018), *rev'd on other ground*, 52 F.4th 593 (4th Cir. 2022) (en banc).
[216] 672 F. Supp. 346, 360 (S.D. Ind. 1987), *aff'd*, 843 F.2d 1059 (7th Cir. 1988).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

states an offense, the Indictment alleges a five-year conspiracy concerning the falsification of company documents while simultaneously alleging that Lenz wasn't at the company for that entire period.

As stressed above, the dates on which Lenz joined and withdrew from the conspiracy define the outer limits of liability on Count 4 and, therefore, define the nature of the charge that the defense must be prepared to meet.[217] Lenz can be held liable or vicariously liable only for conduct that occurs during the time when he is *part* of the conspiracy—not before and not after.[218] Thus, the information that the defense is requesting is necessary for it to understand the charge against Lenz in Count 4.

It follows that a bill of particulars is needed to identify this missing information. Without knowing when Lenz joined or withdrew from the conspiracy, the defense can't fully understand the nature of the charge in Count 4, let alone prepare a defense to it, and it will be unfairly surprised at trial. Other courts have recognized the importance of this information and ordered the Government to disclose it. For example, in numerous cases, the Eastern District of Wisconsin has directed the Government to provide a bill of particulars that identifies "the date (month and year)" of when a defendant purportedly joined and withdrew from the conspiracy because that information is "essential to ensuring

---

[217] *See supra* at 53 (citing and discussing *Grunewald*, 353 U.S. 391).

[218] *E.g., Levine v. United States,* 383 U.S. 265, 266 (1966) (per curiam) (mem.) (Government conceded that "an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy"); *Sykes,* 2018 WL 3245205, at *4 (date on which defendant joined conspiracy affected "whether a particular statement was allegedly made in furtherance of" it).

65

various constitutional rights" are honored and "crucial to preparing an adequate defense."[219] Indeed, that court has described it as "common" to do so.[220] Nor is this practice limited to that District.[221] This Court, too, should order the Government to provide the defense with the dates on which it contends Lenz joined the conspiracy and withdrew from it.

**D.    The defense can't identify this information for itself and must have a bill of particulars.**

Although the Government indicated that it believes its production of discovery obviates the need for a bill of particulars, that simply isn't the case. As a preliminary matter, when discovery is voluminous (as it is here), that volume "weighs in favor of the bill of particulars."[222] Indeed, courts across the country have ordered the Government to provide bills of particulars, in light of the volume of discovery, in cases with discovery far *less* voluminous than this one.[223] Indeed, "voluminous" is an understatement for the discovery in this case. There are hundreds of thousands of documents, totaling more than

---

[219] *United States v. Barnes*, No. 9-cr-248, 2010 WL 1418874, at *12 (E.D. Wis. 2010); *United States v. Rodriguez*, 2009 WL 1110415, at *5 (E.D. Wis. 2009).

[220] *Sykes*, 2018 WL 3245205, at *4 (collecting cases).

[221] *E.g.*, *United States v. Aispuro*, No. CR 08-2936 JB, 2010 WL 1404196, at *6 (D.N.M. Mar. 16, 2010) (ordering Government to provide bill of particulars that identifies date by which it contends defendant joined the conspiracy); *Ramirez*, 54 F. Supp. 2d at 30 (same; collecting additional authorities).

[222] *Meek*, 2020 WL 2218953, at *5; *accord Elbaz*, 332 F. Supp. 3d at 982 (ordering bill of particulars identifying all alleged false statements where "voluminous discovery makes it difficult for the defense to identify which statements . . . will be at issue at trial").

[223] *E.g.*, *United States v. Michel*, No. 19-cr-148-CKK, 2019 WL 5797669, at *17–18 (D.D.C. Nov. 6, 2019) (bill of particulars warranted where Government "produced significant discovery" of "over 35,000 documents"); *United States v. Redding*, 540 F. Supp. 2d 1184, 1188 (D. Kan. 2008) (where government had "provided boxes of discovery," court ordered bill of particulars detailing "known" co-conspirators "so that defendant [could] better defend his case").

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

1.3 million pages of discovery. And even setting aside the number of documents, the Government has produced baghouse logs containing nearly 46,000 entries—any one of which it might contend is false.

More importantly, though, no amount of digging through the discovery would leave the defense with sufficient information about what statements, which individuals, or the dates that *the Government* believes connect Lenz to these purported crimes. Indeed, even if it were physically possible to extract each log entry or the name of every potential co-conspirator from the voluminous discovery, the defense would be left to *guess* at whether the Government might contend at trial that that statement was false, that individual actually was a co-conspirator, or that a particular date is the relevant one. And no amount of document review or guesswork will bring the defense any closer to knowing when *the Government* contends Lenz joined or withdrew from the multi-year conspiracy.[224] Instead, a bill of particulars is needed.

---

[224] *E.g.*, *Barnes*, 2010 WL 1418874, at *12 (bill of particulars identifying dates that defendant purportedly joined and withdrew from conspiracy appropriate because that information "is not likely to be found in the discovery").

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**V.    Fifth Pretrial Motion: The Government must proffer all the statements that it may seek to admit under Rule 801(d)(2)(E) for a pre-trial ruling as to their admissibility.**

In addition to a bill of particulars, the defense moves for an order requiring the Government to provide pre-trial notice and an accompanying *Santiago* proffer of the statements it may seek to admit at trial under Rule 801(d)(2)(E). As set out below, pre-trial disclosure of these statements—which the defense anticipates will be voluminous, given the extent of the discovery in this case—should be scheduled in advance of the parties filing motions *in limine*, in order to make that motions practice most efficient. And a pre-trial ruling on the admissibility of those statements will streamline trial disputes, if not the trial itself.

Rule 801(d)(2)(E)'s carve-out from the hearsay bar has significant consequences for the trial's contours. An out-of-court statement isn't considered hearsay, even if submitted for its truth, if it "is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy."[225] Those type of statements, if admitted, can prove damning against someone who *didn't* utter them, because, as discussed above, a defendant is held vicariously liable for acts taken by his co-conspirators in furtherance of the conspiracy.

Trial courts frequently make pre-trial rulings about the admissibility of a purported co-conspirator statement. Such a statement is admissible only if the trial court determines that "it is more likely than not that the declarant and the defendant were

---

[225] Fed. R. Evid. 801(d)(2)(E).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy."[226] The statements themselves are relevant to that assessment, but they aren't sufficient; the Government must corroborate them with "at least some supporting evidence."[227] Although the court could wait until trial to make this statement-by-statement determination, the "preferable procedure" is to "require the government to preview the evidence which it believes brings the statements within the co-conspirator rule *before* delving into the evidence at trial."[228]

The defense asks the Court to follow that preferred procedure in this case, because a *Santiago* proffer and pre-trial ruling on admissibility will streamline both trial preparation and the trial itself. The "last thing" any court wants is "a trial extended by mid-trial arguments outside the presence of the jury over whether particular co-conspirator statements are admissible as to everyone, someone, et cetera."[229] And the likelihood of mid-trial delays increases where the record is voluminous, creating a higher volume of potential co-conspirator statements, or there are multiple defendants, any one of whom might object to the admissibility of any particular statement as to him. Both factors exist here. And the risk of mid-trial delay can be mitigated by way of a pre-trial proffer of any statement that the Government may contend is a co-conspirator statement, responsive briefing that crystallizes the areas of dispute, and a pre-trial ruling resolving them. Litigating

---

[226] *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir. 1978) (citing Fed. R. Evid. 104), *overruled in part on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987).

[227] *United States v. Ranochak*, No. 17-cr-73 JD, 2022 WL 4115771, at *1 (N.D. Ind. Sept. 9, 2022).

[228] *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (alteration adopted) (emphasis added).

[229] Tr. of Mot. Hr'g at 17, *United States v. Meskin*, No. 21-cr-112 (C.D. Cal. Aug. 26, 2022), R.187-2.

69

the issue before the jury is sworn-in will reduce the number of side-bar arguments at trial and ensure that the jury is not kept waiting while the parties debate matters that could've been resolved ahead of time.

Indeed, the Court's ruling on the admissibility of purported co-conspirator statements may substantially reduce the scope of this multi-week trial. If the Government can't establish by even a preponderance of the evidence that the defendants were members of a conspiracy at the time they purportedly made statements in furtherance of it, then that may streamline (or eliminate) its case. Courts routinely determine that pre-trial proffers are insufficient. For example, just last month, the Northern District of Georgia denied the Government's motion to admit statements by eleven purported co-conspirators because its pre-trial proffer was insufficient to establish a conspiracy to violate the anti-kickback statute.[230] Similarly, in *United States v. Jett*, the Southern District of Indiana denied the Government's motion to admit an interrogation room statement where it provided insufficient supporting evidence in its pre-trial proffer.[231] And in *United States v. Fassnacht*, the Northern District of Illinois excluded a tape-recorded statement where the Government had not carried its burden under Rule 801(d)(2)(E) in a pre-trial *Santiago* proffer.[232] In each of these cases, trial proceedings were streamlined by the district courts' efficient pre-trial rulings.

---

[230] Redacted Order at 38–39, *United States v. Holland*, No. 17-cr-234 (N.D. Ga. Nov. 21, 2022), R.621.
[231] *See* No. 16-CR-1, 2017 WL 402154, at *3 (S.D. Ind. Jan. 30, 2017).
[232] *See* No. 01 CR 63, 2002 WL 63523, at *10 (N.D. Ill. Jan. 15, 2002).

70

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The defense submits that the Government should be ordered to provide its *Santiago* proffer six weeks before the parties file their motions *in limine.* This timeline anticipates that the Government's list of statements may be extensive, given the volume of discovery, and it should give the defense sufficient time to review that list and respond as part of its motions *in limine* practice. This proposed schedule also gives the Government ample time to prepare its proffer, as the Court set trial for the fall of 2023 and can fashion any motions *in limine* deadline with this pre-trial proffer in mind.

## CONCLUSION

The explosion at Didion in May 2017 was horrific. Its carnage, however, can't include prosecuting Lenz for unrelated white-collar offenses on a faulty indictment. Nor can the corporation's alleged regulatory violation, which the Government believes contributed to that explosion, be tried with Lenz's wholly unrelated offenses. Doing so would result in a conviction arising from spillover prejudice, rather than a dispassionate assessment of his culpability. At a minimum, that misdemeanor count must be severed. But, on account of all the other flaws in the Indictment that the defense has highlighted above, the case against Lenz should be dismissed in full. And if the case should proceed to trial, Count 6 should be dismissed in part and the Court should order the Government to provide the defense with a bill of particulars and pre-trial proffer about alleged co-conspirator statements.

71

Dated in Madison, Wisconsin, this 22nd day of December, 2022.

Respectfully submitted,

*/s/ Joseph A. Bugni*
Joseph A. Bugni

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger

FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, WI  53703
(608) 260-9900
joseph_bugni@fd.org
jessica_ettinger@fd.org

*Counsel for James Lenz*

72